## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| QUADRANT STRUCTURED PRODUCTS COMPANY, LTD., Individually and Derivatively on behalf of Athilon Capital Corp., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | C.A. No. 6990-VCL |
| VINCENT VERTIN, MICHAEL SULLIVAN, PATRICK B. GONZALEZ, BRANDON JUNDT, J. ERIC WAGONER, ATHILON CAPITAL CORP., ATHILON STRUCTURED INVESTMENT ADVISORS LLC, and EBF & ASSOCIATES, LP, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## OPINION

Date Submitted: July 22, 2014
Date Decided: October 1, 2014

Lisa A. Schmidt, Catherine G. Dearlove, Russell C. Silberglied, Susan M. Hannigan, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Harold S. Horwich, Sabin Willett, Samuel R. Rowley, BINGHAM McCUTCHEN LLP, Boston, Massachusetts; *Attorneys for Plaintiff Quadrant Structured Products Company, Ltd.*

Philip A. Rovner, Jonathan A. Choa, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Philippe Z. Selendy, Nicholas F. Joseph, Sean P. Baldwin, QUINN EMANUEL URQUHART & SULLIVAN, LLP; New York, New York; *Attorneys for Defendants Vincent Vertin, Michael Sullivan, Patrick B. Gonzalez, Brandon Jundt, J. Eric Wagoner, Athilon Capital Corp., and Athilon Structured Investment Advisors LLC.*

Collins J. Seitz, Jr., Garrett B. Moritz, Eric D. Selden, SEITZ ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; *Attorneys for Defendant Merced Capital, L.P., formerly known as EBF & Associates, LP.*

**LASTER, Vice Chancellor.**

Plaintiff Quadrant Structured Products Company, Ltd. ("Quadrant") owns debt securities issued by defendant Athilon Capital Corp. ("Athilon" or the "Company"), a Delaware corporation. Quadrant alleges that Athilon is insolvent and that the individual defendants, who are members of Athilon's board of directors (the "Board"), should wind up the Company's business and dissolve the entity. Quadrant contends that instead, the Board has found ways to transfer value preferentially to Athilon's controller, defendant EBF & Associates ("EBF"). In this action, Quadrant has asserted breach of fiduciary duty claims derivatively against the Board and EBF. Quadrant has also asserted fraudulent transfer claims directly against EBF and its affiliate, Athilon Structured Investment Advisors, LLC ("ASIA"). The defendants have moved to dismiss the complaint. Their motion is denied to the extent that Quadrant has challenged specific transfers of value to EBF or ASIA. To the extent that Quadrant has challenged the Board's business decision to take on greater risk, the motion to dismiss is granted.

## I.    FACTUAL BACKGROUND

The facts are drawn from Quadrant's verified amended complaint (the "Complaint" or "Compl.") and the documents it incorporates by reference. At this procedural stage, the Complaint's allegations are assumed to be true, and Quadrant receives the benefit of all reasonable inferences.

### A.    The Company And Its Business Model

Athilon is a credit derivative product company created to sell credit protection to large financial institutions. The Company's wholly owned subsidiary, Athilon Asset Acceptance Corp. ("Asset Acceptance"), wrote credit default swaps on senior tranches of

1

collateralized debt obligations. The Company guaranteed the credit swaps that Asset Acceptance wrote. In a typical transaction, Asset Acceptance sold protection to a bank in the form of a credit swap that referred to a designated pool of investment grade debt securities, known as "Reference Obligations." If the pool of Reference Obligations suffered net losses that exceeded a contractually defined figure, then Asset Acceptance was liable up to a fixed limit. The Company was liable as the guarantor of Asset Acceptance's performance.

To obtain and maintain a AAA/Aaa credit rating, which was essential to the Company's business model, the ratings agencies required the Company to have a limited business purpose and to adopt and follow operating guidelines for its business (the "Operating Guidelines"). The Amended and Restated Certificate of Incorporation for the Company (the "Athilon Charter") limits its business to "guaranteeing or providing other forms of credit support for the obligations of its subsidiaries" and activities related to that business. The Amended and Restated Certificate of Incorporation for Asset Acceptance (the "Asset Acceptance Charter") limits its business to "transactions judged by [Asset Acceptance] to be credit default swaps" and activities related to that business.

Both the Athilon Charter and the Asset Acceptance Charter require that their businesses be "conducted in compliance with the Operating Guidelines." The Operating Guidelines:

- limit the business activities of the Company and Asset Acceptance;
- impose structural, portfolio, and leverage constraints on their operations;

2

- establish ratings categories for the collateralized debt obligations covered by the credit swaps written by Asset Acceptance and guaranteed by the Company;

- cap the aggregate notional amount of any single credit swap;

- limit the permissible maturity of credit swaps;

- limit the nature of credit events that could give rise to payment obligations under the credit swaps;

- restrict the Company to investing in short-term, low-risk securities, such as U.S. government and agency securities, certain Euro-dollar deposits, bankers' acceptances, commercial paper, repurchase transactions, money market funds, and money market notes with high short-term ratings;

- require that its portfolio contain sufficient assets to cover all liabilities; and

- define certain Suspension Events relating to capital shortfalls, leverage ratios, downgrades in counterparty credit ratings, and the insolvency, bankruptcy, or reorganization of the Company or Asset Acceptance.

The Operating Guidelines provide that if a Suspension Event is not timely cured, then the Company enters runoff. Once in runoff, the Company can no longer pay dividends or write new guarantees for credit swaps. While in runoff, its operations are limited to paying off outstanding swap transactions as they mature. After the runoff process is complete, the Operating Guidelines obligate the Company to liquidate.

**B.      The Company's Capital Structure And Financial Difficulties**

To fund its business, the Company secured approximately $100 million in equity capital and $600 million in long-term debt. The debt was issued in multiple tranches comprising $350 million in Senior Subordinated Notes, $200 million in Subordinated Notes, and $50 million of the Junior Subordinated Notes. Depending on the series, the Notes will mature in 2035, 2045, 2046, or 2047. Interest payments on all of the Notes are deferrable at the Company's option for up to five years. Each class of Notes is

subordinate to the Company's credit default swap obligations. On the strength of its $700 million in committed capital, the Company guaranteed more than $50 billion in credit default swaps written by Asset Acceptance.

Two of the credit swaps that Asset Acceptance wrote referenced residential mortgage-backed securities, rather than corporate debt obligations. In late 2008, the Company paid $48 million to unwind the first swap. In 2010, the Company paid $320 million to unwind the second swap. The termination payments wiped out over half of the Company's committed capital, including all of its equity capital and 65% of its long-term debt.

The effects of the 2008 financial crisis inflicted broader and more permanent damage on the Company. After Lehman Brothers filed for bankruptcy in September 2008, financial institutions no longer entered into credit swaps with entities that lacked substantial capital and could not post adequate collateral. As a result of the financial crisis, the Company and Asset Acceptance no longer could engage in the only business that their charters and the Operating Guidelines permitted them to pursue.

At the end of 2008, the Company and Asset Acceptance lost their AAA/Aaa ratings. By August 2010, the Company and Asset Acceptance no longer had any investment grade debt or counterparty credit ratings. Under the Operating Guidelines, the loss of its AAA/Aaa ratings and significant capital deficiencies forced the Company into runoff.

## C.    EBF Takes Over An Insolvent Company

The collapse of the credit derivative industry caused the Company's securities to trade at deep discounts, reflecting the widely held view that the Company was insolvent. EBF purchased all of the Company's Junior Subordinated Notes, then bought all of the Company's equity in 2010. By doing so, EBF gained control over the Company and its Board.

After acquiring control over the Company, EBF placed Vincent Vertin on the Board. Vertin is a partner at EBF who concentrates on EBF's investments in credit derivative product companies, and the Complaint alleges that Vertin's compensation is tied to the performance of EBF's in credit derivative product companies.

EBF also placed Michael Sullivan on the Board. Sullivan is an in-house attorney for EBF. Like Vertin, Sullivan concentrates on EBF's investments in credit derivative product companies.

EBF placed two other individuals on the Board whom EBF designated as independent directors. One is Brandon Jundt, a former employee of EBF. The other is J. Eric Wagoner.

The fifth and final Athilon director is Patick B. Gonzalez, the CEO of the Company.

Quadrant purchased debt securities issued by the Company after the EBF takeover. Quadrant acquired Senior Subordinated Notes in May 2011 and Subordinated Notes in July 2011.

**D.      Transfers Of Value From The Company To EBF**

The Complaint alleges that the Company had been insolvent for some time before the EBF takeover. The Complaint alleges that the Company continues to be insolvent and cannot return to solvency because the credit default industry has collapsed, and the Athilon Charter, the Asset Acceptance Charter, and the Operating Guidelines prohibit the Company from engaging in other lines of business. At this point, the Company consists of a legacy portfolio of guarantees on credit default swap contracts written by Asset Acceptance that will continue to earn premiums until the last contracts expire in 2014 or shortly thereafter.

According to the Company's Consolidated Statement of Financial Condition as of September 30, 2011 (the "September 2011 Financials") the Company carries $600 million in debt, excluding its outstanding credit swaps, against assets with a saleable value of only $426 million. The Company's GAAP shareholder's equity was stated at negative $660 million as of that same date. At the time of the filing of the Complaint, the Company was rated BB by Standard & Poor's and Ba1 by Moody's.

The Complaint alleges that a well-motivated board of directors faced with these circumstances would maximize the Company's economic value for the benefit of its stakeholders by minimizing expense during runoff, then liquidating the Company and returning its capital to its investors. The Complaint alleges that instead, the EBF-controlled Board is using the Company's assets to benefit EBF.

The Complaint alleges that the Board has transferred value from Athilon to EBF by continuing unnecessarily to make interest payments on the Junior Notes, which EBF

owns. The Board has the authority to defer interest payments on the Junior Notes without penalty for a period of time that would exceed the term of the remaining credit swaps. Once the last credit swap expires, the Operating Guidelines require that the Company liquidate. The Junior Notes are currently out of the money and would not recover anything in an orderly liquidation. The Company therefore has no reason to pay interest on the Junior Notes, because by the time the interest would be due, the Company will have dissolved and liquidated with the Junior Notes taking nothing. The Complaint alleges that an independent Board presented with this situation would defer payments of interest on the Junior Notes to conserve assets for the Company's more senior creditors. But because EBF holds the Junior Notes, the EBF-controlled Board has continued paying interest.

The Complaint also alleges that the Board has transferred value from Athilon to EBF by causing the Company to pay excessive fees to ASIA, which EBF indirectly owns and controls. In 2004, Athilon and Asset Acceptance entered into a services agreement with ASIA. In 2009, before the EBF takeover, the Company paid approximately $14 million in fees under the services agreement. After the Company entered runoff, the scope of ASIA's services substantially diminished and its fees should have decreased. Instead, after the EBF takeover, the fees paid to ASIA climbed dramatically and far exceeded market rates. In 2010, the Company paid $23.5 million in fees to ASIA, including a $2.5 million service fee to EBF. The market rate for ASIA's services would be $5-7 million per year. In 2011, Quadrant offered to provide comparable services for a flat fee of $5 million plus an estimated $2 million in costs for third party professionals.

7

The Board rejected Quadrant's offer without taking any action to investigate it and has not reduced the fees it pays to ASIA.

The Complaint similarly alleges that the Board has transferred value from Athilon to EBF through a software license agreement. In 2004, the Company entered into a software license agreement with ASIA. In 2009, the license agreement fee was $1.25 million. In 2010, after the EBF takeover, it increased to $1.5 million. The Complaint alleges that the software license fee is well above market and exceeds what it would cost for the Company to build the licensed capital models from scratch.

Finally, the Complaint alleges that the Board is changing the Company's business model to make speculative investments for the benefit of EBF. Under the Athilon Charter, the Asset Acceptance Charter, and the Operating Guidelines, the Company only can invest in highly-rated, short-term debt securities. In May 2011, the Board sought permission from the rating agencies to amend the Operating Guidelines to loosen the Company's investment restrictions and expand its permitted investments. The rating agencies confirmed that the amendments would not cause a downgrade in Athilon's already low credit rating. The Complaint alleges that the Board subsequently took steps to amend the Operating Guidelines to permit Athilon to invest in longer-dated and riskier investments.

As an example of the shift in investment strategy, Athilon repositioned a portion of its auction rate securities portfolio in the first quarter of 2011. In doing so, Athilon sold securities with a par value of $25 million and purchased other securities that were not as

highly rated and did not carry the short-term maturities that Athilon's original Operating Guidelines required.

The Complaint alleges that by adopting an investment strategy that involves greater risk, albeit with the potential for greater return, the Board is acting for the benefit of EBF and contrary to the interests of other stakeholders, such as the Company's more senior creditors. Because EBF owns the Company's equity and Junior Notes, which are currently underwater, EBF does not bear any of the risk if the investment strategy fails. Only Quadrant and the other more senior creditors bear the downside risk. If the riskier investment strategy succeeds, however, then EBF will capture the benefit.

E.     Procedural History

Despite having yet to move beyond the pleadings stage, this case has amassed an extended procedural history. Quadrant commenced this action on October 28, 2011, and filed the currently operative Complaint on January 6, 2012. The defendants moved to dismiss the Complaint, arguing among other things that Quadrant failed to comply with no-action clauses in the indentures that governed Quadrant's notes. The arguments that Quadrant made before this court about the no-action clauses had been addressed and rejected in two well-known Court of Chancery opinions, *Feldbaum v. McCrory Corp.*, 1992 WL 119095 (Del. Ch. June 2, 1992) (Allen, C.), and *Lange v. Citibank N.A.*, 2002 WL 2005728 (Del. Ch. Aug. 13, 2002) (Strine, V.C.). Finding those opinions to be directly on point, this court granted the motion to dismiss by order dated June 5, 2012.

Quadrant appealed. Before the Delaware Supreme Court, Quadrant advanced new arguments about how specific language of the no-action clauses in the Athilon notes

9

differed from the no-action clauses at issue in *Feldbaum* and *Lange*. This court had not had the chance to address those arguments, which were raised for the first time on appeal. Finding the record "insufficient for appellate review," the Delaware Supreme Court remanded and directed this court to write a report addressing the newly raised arguments. *Quadrant Structured Prods. Co. v. Vertin*, No. 388, 2012 ¶ 1 (Del. Feb. 12, 2013). In light of the new arguments, this court's report concluded that the no-action clauses in the Athilon notes did not apply to Counts I through VI and IX of the Complaint, or to Count X to the extent that it sought to impose liability on secondary actors for violations of the other counts. The report concluded that the no-action clauses continued to bar Counts VII and VIII of the Complaint, as well as Count X to the extent it sought to impose liability on secondary actors for violations of the indentures. Dkt. 95.

After receiving the report, the Delaware Supreme Court certified the two questions at the heart of its analysis, which were governed by New York law, to the New York Court of Appeals. *Quadrant Structured Prods. Co. v. Vertin*, 2013 WL 5962813, at \*5 (Del. Nov. 7, 2013). In an opinion issued earlier this year, the New York Court of Appeals agreed with the analysis set forth in the report. *Quadrant Structured Prods., Co. v. Vertin*, 23 N.Y.3d 549 (N.Y. 2014).

With the certified questions answered, the Delaware Supreme Court issued a decision applying the reasoning of this court's report and the New York Court of Appeals. As a technical matter, the Delaware Supreme Court's decision reversed the original dismissal of the complaint. *Quadrant Structured Prods. Co. v. Vertin*, 93 A.3d 654 (Del. 2014) (TABLE). The Delaware Supreme Court did not reach the other,

independent grounds that the defendants had advanced in favor of dismissal. The case returned again to this court for a decision on those other arguments.

## II. LEGAL ANALYSIS

The defendants' motion seeks to dismiss the Complaint for failing to state a claim on which relief can be granted. *See* Ch. Ct. R. 12(b)(6). In a Delaware state court, the pleading standards for purposes of a Rule 12(b)(6) motion "are minimal." *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

> When considering a defendant's motion to dismiss, a trial court should accept all well-pleaded factual allegations in the Complaint as true, accept even vague allegations in the Complaint as "well-pleaded" if they provide the defendant notice of the claim, draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof.

*Id.* (footnote omitted). The operative test in a Delaware state court thus is one of "reasonable conceivability." *Id.* at 537 (footnote and internal quotation marks omitted). This standard asks whether there is a "possibility" of recovery. *Id.* at 537 n.13. The test is more lenient than the federal "plausibility" pleading standard, which invites judges to "'determin[e] whether a complaint states a plausible claim for relief' and 'draw on ... judicial experience and common sense.'" *Id.* (alteration in original). Under the Delaware test, a trial court commits reversible error by assessing plausibility. *See Cambium Ltd. v. Trilantic Capital P'rs III L.P.*, 36 A.3d 348, 2012 WL 172844, at *2 (Del. Jan. 20, 2012) (ORDER) ("The Court of Chancery erred by applying the federal 'plausibility' standard in dismissing the amended complaint.").

11

**A.** **Counts I and II: Breach Of Fiduciary Duty Against The Directors And EBF**

In Counts I and II of the Complaint, Quadrant asserts claims for breach of fiduciary duty derivatively on behalf of the Company against the directors and EBF. Count I alleges that the directors breached their duty of loyalty and committed corporate waste by (i) continuing to pay interest on the Junior Notes held by EBF, (ii) paying excessive service and license fees to EBF or ASIA, and (iii) changing the Company's business model to take on greater risk under a strategy where EBF will benefit from any upside as the sole holder of the Junior Notes and the Company's equity, but the Company's more senior creditors including Quadrant will bear the cost of any downside. Count II alleges that EBF has breached its duty of loyalty by engaging in the same actions that are the subject of Count I. The challenges to the failure to defer interest and the payment of excessive fees state claims. The challenge to the Board's change in business strategy does not.

**1.** **Creditor Standing To Assert A Breach Of Fiduciary Duty Claim**

Count I and II constitute an attempt by Quadrant, a corporate creditor, to assert claims for breach of duty against corporate fiduciaries. The directors of a Delaware corporation owe fiduciary duties to the corporation they serve. When determining whether directors have breached their fiduciary duties, Delaware corporate law distinguishes between the standard of conduct and the standard of review.[1] "The standard

---

[1] *See* William T. Allen, Jack B. Jacobs & Leo E. Strine, Jr., *Function Over Form: A Reassessment of the Standards of Review in Delaware Corporation Law*, 56 Bus. Law. 1287, 1295–99 (2001); William T. Allen, Jack B. Jacobs & Leo E. Strine, Jr., *Realigning the Standard of Review of Director Due Care with Delaware Public Policy: A Critique of* Van Gorkom *and its*

of conduct describes what directors are expected to do and is defined by the content of the duties of loyalty and care. The standard of review is the test that a court applies when evaluating whether directors have met the standard of conduct." *In re Trados Inc. S'holder Litig. (Trados II)*, 73 A.3d 17, 35-36 (Del. Ch. 2013).

"[T]he standard of conduct for directors requires that they strive in good faith and on an informed basis to maximize the value of the corporation for the benefit of its residual claimants, the ultimate beneficiaries of the firm's value." *Id.* at 40-41. In a solvent corporation, the residual claimants are the stockholders. Consequently, in a solvent corporation, the standard of conduct requires that directors seek prudently, loyally, and in good faith to "to manage the business of a corporation for the benefit of its shareholder[ ] owners." *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007).

As residual claimants and the ultimate beneficiaries of the fiduciary duties that directors owe to the corporation, stockholders have standing in equity to bring claims derivatively on behalf of the corporation for injury that the corporation has suffered. When a corporation is insolvent, its creditors become the beneficiaries of any initial increase in the corporation's value. *Id.* at 101. The stockholders remain residual claimants, but they can benefit from increases in the corporation's value only after the

---

*Progeny as a Standard of Review Problem*, 96 Nw. U. L. Rev. 449, 451–52 (2002); *see also* E. Norman Veasey & Christine T. Di Guglielmo, *What Happened in Delaware Corporate Law and Governance from 1992–2004? A Retrospective on Some Key Developments*, 153 U. Pa. L. Rev. 1399, 1416–25 (2005) (distinguishing between the standards of fiduciary conduct and standards of review).

more senior claims of the corporation's creditors have been satisfied. "The corporation's insolvency makes the creditors the principal constituency injured by any fiduciary breaches that diminish the firm's value." *Id.* at 101-102 (internal quotation marks omitted). Because the creditors of an insolvent corporation join the class of residual claimants, "equitable considerations give creditors standing to pursue derivative claims against the directors of an insolvent corporation." *Id.* at 102.

Before the Delaware Supreme Court's landmark decision in *Gheewalla*, it was not clear whether directors of an insolvent corporation owed fiduciary duties directly to creditors. In what had long been the Delaware Supreme Court's leading pre-*Gheewalla* decision, the high court stated that:

> An insolvent corporation is civilly dead in the sense that its property may be administered in equity as a trust fund for the benefit of creditors. The fact which creates the trust is the insolvency, and when that fact is established, the trust arises, and the legality of the acts thereafter performed will be decided by very different principles than in the case of solvency.

*Bovay v. H.M. Byllesby & Co.*, 38 A.2d 808, 813 (Del. 1944). The *Bovay* decision could be interpreted to hold that upon insolvency, the beneficiaries of the directors' fiduciary duties shifted from the corporation's stockholders to its creditors, and that after insolvency directors had a fiduciary obligation to preserve value for the benefit of creditors that creditors could enforce.[2] Interpreted in this manner, *Bovay*'s trust fund

---

[2] An elliptical aside in a later Delaware Supreme Court decision provided some support for the reading. *See City Investing Co. Liquidating Trust v. Cont'l Cas. Co.*, 624 A.2d 1191, 1194 (Del. 1993) ("Even though the entity was civilly dead, its assets, like those of an insolvent corporation, were subject to administration in equity as a trust fund for the benefit of its creditors."). Other jurisdictions applied the trust fund doctrine in precisely this fashion. *See, e.g., Fed. Deposit Ins. Corp. v. Sea Pines Co.*, 692 F.2d 973, 976-77 (4th Cir. 1982) ("[W]hen the

doctrine would resemble English law, which imposes personal liability on directors for wrongful trading, which occurs when the directors have continued to operate the company after the point they knew, or should have known, that there was no reasonable prospect of the company avoiding liquidation.[3]

In 1991, Chancellor Allen penned his famous footnote 55 in the *Credit Lyonnais* opinion. *Credit-Lyonnais Bank Nederland, N.V. v. Pathe Commc'ns Corp.*, 17 Del. J. Corp. L. 1099, 1055 n.55 (Del. Ch. Dec. 30, 1991). The influential aside stated:

> The possibility of insolvency can do curious things to incentives, exposing creditors to risks of opportunistic behavior and creating complexities for directors. Consider, for example, a solvent corporation having a single asset, a judgment for $51 million against a solvent debtor. The judgment is on appeal and thus subject to modification or reversal. Assume that the only liabilities of the company are to bondholders in the amount of $12 million. Assume that the array of probable outcomes of the appeal is as follows:

---

corporation becomes insolvent, the fiduciary duty of the directors shifts from the stockholders to the creditors."); *Automatic Canteen Co. of Am. v. Wharton*, 358 F.2d 587, 590 (2d Cir. 1966) ("[D]irectors of an insolvent corporation occupy a fiduciary position toward the creditors, just as they do toward the corporation when it is solvent. We hold them trustees of the corporation's property on behalf of the creditors, so that as a class the creditors should be able to follow the property into the hands of the directors, here acting for the parent."); *Davis v. Woolf*, 147 F.2d 629, 633 (4th Cir. 1945) ("The law by the great weight of authority seems to be settled that when a corporation becomes insolvent, or in a failing condition, the officers and directors no longer represent the stockholders, but by the fact of insolvency, become trustees for the creditors and that they then can not by transfer of its property or payment of cash, prefer themselves or other creditors"); *N.Y. Credit Men's Adjustment Bureau v. Weiss*, 305 N.Y. 1, 7, 110 N.E.2d 397, 398 (1953) ("If the corporation was insolvent at that time it is clear that defendants, as officers and directors thereof, were to be considered as though trustees of the property for the corporate creditor-beneficiaries.")**.**

[3] Insolvency Act 1986 (UK) c 45, § 214. *See generally* Paul L. Davies, *Principles of Modern Company Law* 217-24 (8th ed. 2008); David Kershaw, *Company Law in Context* 729-39 (2009); Sabrina Bruno, *Personal Liability of Corporate Directors Under English Common Law and Italian Civil Law*, 2 U.C. Davis J. Int'l L. & Pol'y 37, 74-78 (1996).

| | Expected Value of Judgment on Appeal | Expected Value |
|---|---|---|
| 25% chance of affirmance | $51mm | $12.75 |
| 70% chance of modification | $4mm | $2.8 |
| 5% chance of reversal | $0 | $0 |

Thus, the best evaluation is that the current value of the equity is $3.55 million. ($15.55 million expected value of judgment on appeal—$12 million liability to bondholders). Now assume an offer to settle at $12.5 million (also consider one at $17.5 million). By what standard do the directors of the company evaluate the fairness of these offers? The creditors of this solvent company would be in favor of accepting either a $12.5 million offer or a $17.5 million offer. In either event they will avoid the 75% risk of insolvency and default. The stockholders, however, will plainly be opposed to acceptance of a $12.5 million settlement (under which they get practically nothing). More importantly, they very well may be opposed to acceptance of the $17.5 million offer under which the residual value of the corporation would increase from $3.5 to $5.5 million. This is so because the litigation alternative, with its 25% probability of a $39 million outcome to them ($51 millon − $12 million = $39 million) has an expected value to the residual risk bearer of $9.75 million ($39 million x 25% chance of affirmance), substantially greater than the $5.5 million available to them in the settlement. While in fact the stockholders' preference would reflect their appetite for risk, it is possible (and with diversified shareholders likely) that shareholders would prefer rejection of both settlement offers.

But if we consider the community of interests that the corporation represents it seems apparent that one should in this hypothetical accept the best settlement offer available providing it is greater than $15.55 million, and one below that amount should be rejected. But that result will not be reached by a director who thinks he owes duties directly to shareholders only. It will be reached by directors who are capable of conceiving of the corporation as a legal and economic entity. Such directors will recognize that in managing the business affairs of a solvent corporation in the vicinity of insolvency, circumstances may arise when the right (both the efficient and the fair) course to follow for the corporation may diverge from the choice that the stockholders (or the creditors, or the employees, or any single group interested in the corporation) would make if given the opportunity to act.

*Id.*[4]

Read against the backdrop of *Bovay* and the trust fund doctrine, footnote 55's expression of concern about insolvency "exposing creditors to risks of opportunistic behavior" and its recognition that "the right (both the efficient and the fair) course" for directors of an insolvent corporation might diverge from what stockholders would want re-invigorated the notion that directors of an insolvent corporation owed fiduciary duties directly to creditors with the potential for creditors to bring breach of fiduciary duty claims against directors if the latter made business decisions that favored stockholders. Judicial opinions after *Credit-Lyonnais* spoke of the directors of an insolvent corporation owing fiduciary duties to the corporation's creditors.[5] This language suggested to some

---

[4] Footnote 55 used the phrase "solvent corporation in the vicinity of insolvency." *Id.* Until *Gheewalla*, debate raged over this concept, which cases and commentators often referred to as the "zone of insolvency." *See, e.g., U.S. Bank N.A. v. U.S. Timberlands Klamath Falls, L.L.C. (Klamath Falls),* 864 A.2d 930, 948 (Del. Ch. 2004), *vacated on appeal*, 875 A.2d 632 (Del. 2005) (TABLE); *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 174 (Del. Ch. 2006) (Strine, V.C.), *aff'd sub nom., Trenwick Am. Litig. Trust v. Billett*, 931 A.2d 438 (Del. 2007) (TABLE); *Blackmore P'rs, L.P. v. Link Energy LLC*, 2005 WL 2709639, at *3 (Del. Ch. Oct. 14, 2005); Neil Ruben, *Duty to Creditors in Insolvency and the Zone of Insolvency: Delaware and the Alternatives*, 7 N.Y.U. J. L. & Bus. 333 (2010). In *Gheewalla*, the Delaware Supreme Court discarded the zone, holding that "[w]hen a solvent corporation is navigating in the zone of insolvency, the focus for Delaware directors does not change: directors must continue to discharge their fiduciary duties to the corporation and its shareholders by exercising their business judgment in the best interests of the corporation for the benefit of its shareholder owners." 930 A.2d at 101. After *Gheewalla*, actual insolvency is the relevant transitional moment. Of course, the point at which a corporation becomes insolvent remains debatable, is difficult to perceive in real-time, and can only be determined definitively by a court in hindsight. I suspect that when Chancellor Allen spoke of "the vicinity of insolvency," he intended to recognize these practical ambiguities, rather than to expand the law. Regardless, given *Gheewalla*'s rejection of the zone, this decision speaks only in terms of insolvency.

[5] *See In re NCS Healthcare, Inc., S'holders Litig.*, 825 A.2d 240, 256 (Del. Ch. 2002) ("as directors of a corporation in the 'zone of insolvency,' the NCS board members also owe fiduciary duties to the Company's creditors"), *rev'd sub nom., Omnicare, Inc. v. NCS*

that creditors of an insolvent corporation, like stockholders, might be able to assert direct claims for breach of fiduciary duty.

In a decision issued in 2004, then-Vice Chancellor, now Chief Justice Strine sought to clarify matters. *See Prod. Res. Grp., L.L.C. v. NCT Grp., Inc.*, 863 A.2d 772 (Del. Ch. 2004). He explained that Chancellor Allen had "attempted to emphasize that directors [of an insolvent corporation] have discretion to temper the risk that they take on behalf of the equity holders." *Id.* at 788. "The *Credit-Lyonnais* decision's holding and spirit clearly emphasized that directors would be protected by the business judgment rule if they, in good faith, pursued a less risky business strategy. . . ." *Id.* "In other words, *Credit Lyonnais* provided a shield to directors from stockholders who claimed that the directors had a duty to undertake extreme risk so long as the company would not technically breach any legal obligation." *Id.*

As to claims by creditors, the Chief Justice explained that even after insolvency, "directors continue to have the task of attempting to maximize the economic value of the firm." *Id.* at 791. He noted that "the fact of insolvency does necessarily affect the constituency on whose behalf the directors are pursuing that end," and that after insolvency, creditors become the initial residual claimants. *Id.* If directors breach their

---

*Healthcare, Inc.*, 822 A.2d 397 (Del. 2002); *Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784, 787 (Del. Ch. 1992) ("neither party seriously disputes that when the insolvency exception does arise, it creates fiduciary duties for directors for the benefit of creditors"); *id.* at 790 ("fiduciary duties to creditors arise when one is able to establish the fact of insolvency"); *see also In re Hechinger Inv. Co. of Del.*, 274 B.R. 71, 89 (D. Del. 2002) ("At the moment a corporation becomes insolvent, however, the insolvency triggers fiduciary duties for directors for the benefit of creditors.").

18

duties by harming the firm, then creditors have standing to assert the firm's derivative claim.

> No particular creditor would have the right to the recovery; rather, all creditors would benefit when the firm was made whole and the firm's value was increased, enabling it to satisfy more creditor claims in order of their legal claim on the firm's assets . . . Thus, regardless of whether they are brought by creditors when a company is insolvent, these claims remain derivative, with either shareholders or creditors suing to recover for a harm done to the corporation as an economic entity . . . .

*Id.* He held out the possibility, however, that under limited circumstances a creditor (or class of creditors) might be able to allege a direct claim if the directors of the insolvent firm took action that frustrated the ability of a particular creditor to recover, to the benefit of other stakeholders. *Id.* at 797; *see id.* at 800 ("I am not prepared to rule out the possibility that [the creditor plaintiff] can prove that the [insolvent company's] board has engaged in conduct towards [the creditor plaintiff] that might support a direct claim for breach of fiduciary duty by it as a particular creditor.").

In *Gheewalla*, the Delaware Supreme Court settled the debate over whether directors of an insolvent corporation owe fiduciary duties directly to creditors. The high court held creditors of an insolvent corporation may sue derivatively, but they "have *no right to assert direct* claims for breach of fiduciary duty against corporate directors." 930 A.2d at 103 (emphasis in original). Creditors of a solvent corporation have no right to assert direct claims for breach of fiduciary duty either, so as a practical matter *Gheewalla* holds that directors never owe fiduciary duties directly to creditors. *See id.* As the Delaware Supreme Court explained, creditors do not need direct fiduciary protection because "creditors are afforded protection through contractual agreements, fraud and

19

fraudulent conveyance law, implied covenants of good faith and fair dealing, bankruptcy law, general commercial law and other sources of creditor rights." *Id.* at 99. In addition, the high court explained that recognizing a direct fiduciary duty to creditors "would create uncertainty for directors who have a fiduciary duty to exercise their business judgment in the best interest of the insolvent corporation [and] create a conflict between those directors' duty to maximize the value of the insolvent corporation for the benefit of all those having an interest in it, and the newly recognized direct fiduciary duty to individual creditors." *Id.* at 103.

In light of *Gheewalla*, I do not believe it is accurate any longer to say that the directors of an insolvent corporation owe fiduciary duties to creditors. It remains true that insolvency "marks a shift in Delaware law," but

> that shift does not refer to an actual shift of duties to creditors (duties do not shift to creditors). Instead, the shift refers primarily to standing: upon a corporation's insolvency, its creditors gain standing to bring derivative actions for breach of fiduciary duty, something they may not do if the corporation is solvent, even if it is in the zone of insolvency.

Robert J. Stearn, Jr. & Cory D. Kandestin, *Delaware's Solvency Test: What Is It and Does It Make Sense? A Comparison of Solvency Tests Under the Bankruptcy Code and Delaware Law*, 36 Del. J. Corp. L. 165, 171 (2011). The fiduciary duties that creditors gain derivative standing to enforce are not special duties to creditors, but rather the fiduciary duties that directors owe to the corporation to maximize its value for the benefit of all residual claimants. *Gheewalla*, 930 A.2d at 101.

## 2. Pleading Insolvency

Under *Gheewalla*, Quadrant gains standing to bring a derivative claim by pleading that the Company is insolvent. A plaintiff can plead insolvency through allegations that meet either the "balance sheet" test or the "cash flow" test. *See Klamath Falls*, 864 A.2d at 947. *See generally* Stearn & Kandestin, *supra*, at 21. Under the balance sheet test, an entity is insolvent if it "has liabilities in excess of a reasonable market value of assets held." *Trenwick*, 906 A.2d at 195 n.74 (Del. Ch. 2006) (internal quotation omitted); *accord Blackmore P'rs,* , 2005 WL 2709639, at *6; *Geyer*, 621 A.2d at 789. In a mature company, the existence of "a great disparity between assets and liabilities . . . at least raises an issue of material fact as to whether the company was insolvent" sufficient to survive a motion to dismiss. *Klamath Falls*, 864 A.2d at 948.

The Complaint's allegations support a reasonable inference that Athilon has been insolvent under the balance sheet test since before the EBF takeover. The Complaint alleges that the Company started with only $100 million in equity capital, borrowed six times that much in the form of long-term debt, and then leveraged its equity capital another 500 times writing credit default swaps. The Complaint describes substantial payments that the Company made to unwind two unsuccessful swap transactions for mortgage backed reference obligations, starting with a $48 million payment in 2008 that wiped out half of the Company's equity capital, followed by a $320 million payment in 2010 that exceeded six times its remaining equity capital. The Complaint explains that in light of the demise of the credit product company business model due to the financial crisis, the Company has no realistic prospect of returning to solvency. The Complaint

21

further explains that by the end of 2008, the Company and Asset Acceptance lost their AAA/Aaa ratings and entered runoff, and by August 2010, the Company and Asset Acceptance no longer had any investment grade debt or counterparty credit ratings.

Focusing on the September 2011 Financials, the Complaint alleges that the Company had $600 million of outstanding bond debt and assets with a fair saleable value of only $426 million. Ironically, the Company in its reply brief disputes the accuracy of this allegation by asserting that the Company's liabilities were actually $747 million—$147 million greater than what the Complaint alleges.

These facts adequately plead insolvency under the balance sheet test. The defendants have sought on several occasions to introduce material outside of the Complaint which they say defeats the pleading-stage inference of insolvency. For the court to consider these submissions would require converting the motion to dismiss into a motion for summary judgment. They have not been considered.

### 3. The Contemporaneous Ownership Requirement

*Gheewalla* indicates that the derivative claims that creditors gain standing to assert are no different than the derivative claims that stockholders could assert. The defendants reason that creditors therefore should have to comply with the same requirements that stockholders must meet, such as the contemporaneous ownership requirement. This decision need not determine whether creditor-plaintiffs should have to comply with other substantive legal doctrines, such as demand excusal or demand refusal, because the defendants have not raised them. The contemporaneous ownership requirement, however,

22

is a statutorily imposed limitation that applies by its terms only to stockholder-plaintiffs. It does not apply to creditors.

Section 327 of the Delaware General Corporation Law imposes the contemporaneous ownership requirement. 8 *Del. C.* § 327. It states:

> In any derivative suit instituted by a stockholder of a corporation, it shall be averred in the complaint that the plaintiff was a stockholder of the corporation at the time of the transaction of which such stockholder complains or that such stockholder's stock thereafter devolved upon such stockholder by operation of law.

*Id.* The contemporaneous ownership requirement has a similarly sounding counterpart— the continuous ownership requirement—which is a judicially created doctrine. *Lambrecht v. O'Neal*, 3 A.3d 277, 284 (Del. 2010). The continuous ownership requirement requires that a stockholder-plaintiff hold shares in the corporation from the commencement of the breach of fiduciary duty lawsuit until its completion. *Id.*

Section 327 is "the only statutory provision [in the Delaware General Corporation Law] dealing with derivative actions." 2 Edward P. Welch et al., *Folk on the Delaware General Corporation Law* § 327.1, at GCL-XIII-42 (5th ed. Supp. 2007). It does not, however, provide stockholders with standing to assert derivative claims. Rather, Section 327 limits derivative standing to a subset of those stockholders who otherwise would have standing to sue at common law.[6]

---

[6] *CML V, LLC v. Bax*, 28 A.3d 1037, 1044 (Del. 2011) (explaining that Section 327 "does not create derivative standing. Rather, it merely limits derivative standing to those stockholders who owned their stock at the time of the allegedly wrongful transaction or whose stock devolved upon them by operation of law from a person who owned the stock at that time."); *accord Schoon v. Smith*, 953 A.2d 196, 201 (Del. 2008) ("Section 327 *does not create the right to sue*

Court of Chancery Rule 23.1 implements Section 327 procedurally by requiring that a stockholder plaintiff plead compliance with the statute. Rule 23.1(a) provides that "the complaint shall allege that the plaintiff was a shareholder . . . at the time of the transaction of which the plaintiff complains or that the plaintiff's shares . . . devolved on the plaintiff by operation of law." Ch. Ct. R. 23.1(a). Through this procedural mechanism, compliance with Section 327 can be addressed on the pleadings rather than at a later stage of the case. Rule 23.1 does not create or provide an independent basis for the contemporaneous ownership requirement. By statute, a Court of Chancery Rule is not permitted to alter substantive law. *See* 10 *Del. C.* § 361(b) ("[R]ules shall be for the purpose of securing the just and, so far as possible, the speedy and inexpensive determination of every such proceeding. The rules shall not abridge, enlarge or modify any substantive right of any party.").

The General Assembly enacted Section 327 in 1945. In doing so, the General Assembly altered Delaware law by restricting a stockholder's ability to sue for fiduciary wrongs that pre-dated his stock ownership. "Under the Delaware Law as it existed prior to the enactment of this statute, in order to maintain a derivative action, a stockholder was not required to be the owner of the shares at the time of the transaction of which he complained." *Rosenthal v. Burry Biscuit Corp.*, 60 A.2d 106, 110 (Del. Ch. 1948) (Seitz,

---

*derivatively, but rather restricts that right*." (emphasis in original) (internal quotation marks omitted)); *Harff v. Kerkorian*, 324 A.2d 215, 218 (Del. Ch. 1974) ("It must be recognized, however, that § 327 does not create the right to sue derivatively but rather restricts that right."), *aff'd in part, rev'd in part on other grounds*, 347 A.2d 133 (Del. 1975).

V.C.) (citing cases). The United States Supreme Court originally created the contemporaneous ownership requirement as a matter of equity in 1881 to prevent corporations from manufacturing diversity jurisdiction for claims against third parties. *See Hawes v. Oakland*, 104 U.S. 450, 461 (1881). That problem did not confront state courts (and it still doesn't). Consequently, "many courts, including Delaware, did not follow the rule of the *Hawes* case [*viz.,* the contemporaneous ownership requirement]." *Burry Biscuit*, 60 A.2d at 111.

For Delaware courts at common law not to adopt the contemporaneous ownership requirement comported with Delaware law regarding the assignment of claims. Equitable claims for breach of fiduciary duty, such as those typically asserted in derivative actions, are freely assignable under Delaware law. A right of action is assignable under Delaware law if it is the type of claim that would survive the death of the assignor and pass to his personal representative. *See Indus. Trust Co. v. Stidham*, 33 A.2d 159, 160-61 (Del. Super. 1942). By statute in Delaware, "[a]ll causes of action, except actions for defamation, malicious prosecution, or upon penal statutes, shall survive. . . ." 10 *Del. C.* § 3701. When a stockholder sells shares, the right to bring a cause of action for breach of fiduciary duty, and the right to benefit from any remedy obtained on that a cause of action, are property rights associated with the shares that pass to the buyer as an incident of the transfer of shares. Even after the adoption of Section 327, Delaware courts continue to recognize that the right to bring a claim for breach of fiduciary duty, including derivatively, is a property right associated with a share of stock and freely assignable. *In re Emerging Commc'ns., Inc. S'holders Litig.*, 2004 WL 1305745, at *29-

25

30 (Del. Ch. May 3, 2004, revised June 4, 2004) (Jacobs, J. (sitting by designation)) (approving assertion of litigation rights by stockholder that purchased those rights from other stockholders). Delaware courts can grant defendants broad, class-wide, transactional releases precisely because these property rights are attributes of the shares and pass with the transfer of shares, thereby moving from the holder who owned them at the time of the wrong to "their transferees, successors, and assigns." *In re Phila. Stock Exch., Inc.*, 945 A.2d 1123, 1139 (Del. 2008); *accord In re Prodigy Commc'ns Corp. S'holders Litig.*, 2002 WL 1767543, at *4 (Del. Ch. July 26, 2002) ("[W]hen Beoshanz sold his shares in the marketplace, the claim relating to the fairness of the then-proposed transaction passed to his purchaser, who enjoyed the benefits of the settlement."); *In re Triarc Cos., Class & Deriv. Litig.*, 791 A.2d 872, 878-79 (Del. Ch. 2001) (explaining owners of stock who sell their shares are "viewed as having sold their interest in the claim with their shares").

Section 327 thus "effected a substantial change in the Delaware Corporation Law." *Burry Biscuit*, 60 A.2d at 110. Before its passage, a stockholder could sue for wrongs pre-dating the acquisition of stock. "After its passage, a stockholder filing a derivative action was required to allege and therefore to prove that he was a stockholder at the time of the transaction of which he complained, or that his stock devolved upon him by operation of law." *Id.* Thus, "[t]he equitable standing of a stockholder to bring a derivative action was judicially created but later restricted by [Section 327]." *Schoon*, 953 A.2d at 204; *accord CML V*, 28 A.3d at 1044.

"It is well-settled that unambiguous statutes are not subject to judicial interpretation." *Leatherbury v. Greenspun*, 939 A.2d 1284, 1288 (Del. 2007). "If the statute as a whole is unambiguous and there is no reasonable doubt as to the meaning of the words used, the court's role is limited to an application of the literal meaning of those words." *Id.* (internal quotation marks omitted); *accord Friends of the H. Fletcher Brown Mansion v. City of Wilmington*, 34 A.3d 1055, 1059 (Del. 2011). By its terms, Section 327 applies only to stockholders. The plain language of the statute does not apply to other corporate constituencies, like creditors, who can under limited circumstances bring derivative claims. "[W]hile [Section 327] should be construed so as to reasonably effectuate its primary purpose—to discourage a type of strike suit—it should not be construed so as to unduly encourage the camouflaging of transactions and thus prevent reasonable opportunities to rectify corporate aberrations." *Schoon*, 953 A.2d at 203-204 (quoting *Maclary v. Pleasant Hills, Inc.*, 109 A.2d 830, 833 (Del. Ch. 1954)).

For reasons that I have discussed elsewhere, I do not believe that a coherent and credible policy justification has ever been offered for Section 327's limitation on the ability of stockholders to assert pre-transfer claims. *See* J. Travis Laster, *Goodbye to the Contemporaneous Ownership Requirement*, 33 Del. J. Corp. L. 673 (2008). The purposes that have been proffered for Section 327's limitation on stockholder standing (i) ignore the two-fold nature of the derivative action, *id.* at 676-77, (ii) conflict with Delaware law on the assignability of claims, *id.* at 680-81, (iii) do not match up with how the statute operates, *id.* at 682-84, 688-91, or (iv) stand in tension with financial and economic theory, *id.* at 685-88. Section 327 is obviously the law of Delaware, and this court is

27

bound to apply the law as enacted by the General Assembly. But applying Section 327 as enacted is a different thing than expanding it to apply to a class of plaintiffs that the language nowhere mentions. Rather than enforcing the literal meaning of the statute in accordance with its terms, applying it to creditors would re-write Section 327 expansively.

Extending Section 327 to creditors also would stand in tension with the ability of creditors to assert claims that pre-date the point when they acquire standing to sue. For stockholders, standing to sue and stock ownership are synonymous, and Section 327 prevents stockholders from asserting claims that arose before they acquired their stock ownership. For creditors, standing to sue depends on two inputs: creditor status (analogous to stock ownership) and corporate insolvency. In his *Production Resources* decision, Chief Justice Strine explained while serving as a Vice Chancellor that creditors are *not* prevented from bringing derivative claims that pre-date the corporation's insolvency. After positing a situation in which a firm becomes insolvent "*after* the acts that are alleged to have been fiduciarily improper," he explained that a creditor in that situation would be included within "the class of those eligible to press the claim derivatively." *Prod. Res.*, 863 A.2d at 792 (emphasis in original). Later in the same decision, the Chief Justice again posited situations when directors engaged in fiduciary wrongdoing before the firm became insolvent and noted that after the firm became insolvent, the claim could be "asserted by creditors" or by a trustee in bankruptcy. *Id.* at 794. This makes sense as a matter of policy because one of the rationales for conferring standing on creditors recognizes that once the corporation reaches the point of

28

insolvency, the creditors become the primary beneficiary of any increase in the value of the corporation. *Gheewalla*, 930 A.2d at 102; *Prod. Res.*, 863 A.2d at 792. Stockholders have less incentive to sue because the recovery is less likely to benefit them. *Trenwick*, 906 A.2d at 195 n.75. It is entirely possible, perhaps even likely, that breaches of fiduciary duty that cause, hasten, or otherwise contribute to insolvency will have occurred before the point of insolvency in fact. If creditors lack standing to assert claims that pre-dated the point of insolvency, then the number of possible plaintiffs will be few: stockholders will lack the incentive, and creditors will lack the ability. Because of how they gain standing to sue, creditors can and should be able to assert claims that arose before they gained standing. To extend Section 327 to creditors would conflict with this approach.

Importantly, it does not necessarily follow from this analysis that a creditor-plaintiff need not comply with other substantive doctrines applicable to derivative actions, such as demand excusal and demand refusal. As with Section 327, Court of Chancery Rule 23.1 implements the substantive requirements of demand futility and demand refusal as pleading requirements by providing that "[t]he complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort." Ch. Ct. R. 23.1(a). By its terms, Rule 23.1 only applies to "a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated corporation." Ch. Ct. R. 23.1(a). The rule later defines "an unincorporated association" to

29

include "a statutory trust, business trust, limited liability company and a partnership (whether general or limited)," and a "member" to include "a person permitted by applicable law to bring a derivative action to enforce a right [of] such unincorporated association." Ch. Ct. R. 23.1(e).

Although Rule 23.1 does not mention creditor-plaintiffs when addressing either contemporaneous ownership or demand futility and demand refusal, the underlying substantive rules do not preclude a requirement that creditor-plaintiffs comply with these doctrines. A corporate claim is an asset of the corporation, so authority over the claim ordinarily rests with the board of directors. *See* 8 *Del. C.* § 141(a); *Zapata Corp. v. Maldonado*, 430 A.2d 779, 782 (Del. 1981). The doctrines of demand excusal and demand refusal protect the board's authority under Section 141(a) and prevent a derivative plaintiff from usurping the board's prerogative to decide how to handle a corporate claim.[7] These substantive doctrines flow from the "two-fold" nature of the derivative suit. *Aronson*, 473 A.2d at 811. "First, it is the equivalent of a suit . . . to compel the corporation to sue. Second, it is a suit by the corporation . . . against those

---

[7] *See Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984). In *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000), the Delaware Supreme Court overruled seven precedents, including *Aronson*, to the extent they reviewed a Rule 23.1 decision by the Court of Chancery under an abuse of discretion standard or otherwise suggested deferential appellate review. *Id.* at 253 n.13. The *Brehm* Court held that, going forward, appellate review of a Rule 23.1 determination would be *de novo* and plenary. *Id.* at 253. *Aronson* and the other six precedents otherwise remain good law. This decision does not rely on any of them for the standard of appellate review and therefore omits the cumbersome subsequent history regarding *Brehm*.

liable to it."[8] For a plaintiff obtain the right to compel the corporation to sue, the plaintiff must establish demand futility or demand refusal as a matter of substantive Delaware law. *Accord Ainscow v. Sanitary Co. of Am.*, 180 A. 614, 615 (Del. Ch. 1935) (Wolcott, C.) (citing *Sohland v. Baker*, 141 A. 277, 281-82 (Del. 1927)). Rule 23.1 does not create the demand requirement; it is merely the "procedural embodiment of this substantive principle." *Rales v. Blasband*, 634 A.2d 927, 932 (Del. 1993); *accord Kamen v. Kemper Fin. Serv., Inc.*, 500 U.S. 90, 96-97 (1991) (holding that the underlying demand requirement is substantive and the Rule 23.1 pleading requirement is procedural).

Because Rule 23.1 is procedural, whether a creditor would need to satisfy the demand excusal or demand refusal requirements depends not on Rule 23.1 but rather on the underlying substantive principle of law, just as whether a creditor must satisfy Section 327 turns not on Rule 23.1 but on the substantive language of the statute. The requirements of demand futility or demand refusal flow from Section 141(a), which

---

[8] *Aronson*, 473 A.2d at 811; *accord Schoon*, 953 A.2d at 201-02 (tracing history of derivative action and explaining its dual nature); *Spiegel v. Buntrock*, 571 A.2d 767, 773 (Del. 1990) (citing the "two-fold" nature of the derivative action); *Sternberg v. O'Neil*, 550 A.2d 1105, 1124 n.41 (Del. 1988) ("The normal derivative suit was 'two suits in one: (1) The plaintiff brought a suit in equity against the corporation seeking an order against it; (2) to bring a suit for damages or other legal injury for damages or other relief against some third person who had caused legal injury to the corporation.'" (quoting Robert C. Clark, *Corporate Law* 639–40 (1986))); *Kaplan v. Peat, Marwick, Mitchell & Co.,* 540 A.2d 726, 730 (Del. 1988) (describing the "two-fold" nature of the derivative action); *Zapata*, 430 A.2d at 784 (citing "the 'two phases' of a derivative suit, the stockholder's suit to compel the corporation to sue and the corporation's suit"); *Harff*, 324 A.2d at 218 ("The nature of the derivative suit is two-fold: first, it is the equivalent of a suit by the stockholders to compel the corporation to sue; and second, it is a suit by the corporation, asserted by the stockholders in its behalf, against those liable to it."); *Cantor v. Sachs*, 162 A. 73, 76 (Del. Ch. 1932) (Wolcott, C.) (explaining that a derivative suit has "two phases—one is the equivalent of a suit to compel the corporation to sue, and the other is the suit by the corporation . . . against those liable to it.").

31

makes the authority of the board of directors paramount. Section 141(a) does not distinguish between stockholders, creditors, or other corporate constituencies. It is therefore possible that creditors could be required to comply with the doctrines of demand futility and demand excusal.

This court has previously declined to address whether a creditor seeking to bring a derivative action must comply with the requirement to show demand excusal or demand refusal, noting that arguments could be made both in favor of and against applying these doctrines to creditor-plaintiffs. *Prods. Res.*, 863 A.2d at 796. This decision need not address this issue either, because the defendants did not raise demand futility or demand refusal as an objection to Quadrant's derivative claims. This decision discusses these doctrines only to make clear that its holding on Section 327 does not dictate the non-application of demand doctrines to creditor claims. This decision holds that Section 327 does not apply to creditor suits based on the plain language of the statute, and its analysis is limited to the contemporaneous ownership requirement that Section 327 imposes.

### 4. The Derivative Claim For Paying Interest On The Junior Notes

Counts I and II identify three decisions by which the members of the Board allegedly breached their duties to the Company. The first was the decision to continue paying interest on the Junior Notes. The allegations on this issue state a claim on which relief can be granted.

To determine whether directors have made a decision that breached their fiduciary duties, a Delaware court examines their actions through the lens of a standard of review. "Delaware has three tiers of review for evaluating director decision-making: the business

32

judgment rule, enhanced scrutiny, and entire fairness." *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011). Which standard of review applies will depend initially on whether the board members:

> (i) were disinterested and independent (the business judgment rule), (ii) faced potential conflicts of interest because of the decisional dynamics present in particular recurring and recognizable situations (enhanced scrutiny), or (iii) confronted actual conflicts of interest such that the directors making the decision did not comprise a disinterested and independent board majority (entire fairness). The standard of review may change further depending on whether the directors took steps to address the potential or actual conflict, such as by creating an independent committee, conditioning the transaction on approval by disinterested stockholders, or both.

*Trados II*, 73 A.3d at 36.

Delaware's default standard of review is the business judgment rule, a principle of non-review that "reflects and promotes the role of the board of directors as the proper body to manage the business and affairs of the corporation." *In re Trados Inc. S'holder Litig. (Trados I)*, 2009 WL 2225958, at *6 (Del. Ch. July 24, 2009). The rule presumes that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson*, 473 A.2d at 812. Unless one of its elements is rebutted, "the court merely looks to see whether the business decision made was rational in the sense of being one logical approach to advancing the corporation's objectives." *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 598 (Del. Ch. 2010) (Strine, V.C.). "Only when a decision lacks any rationally conceivable basis will a court infer bad faith and a breach of duty." *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 34 (Del. Ch. 2014).

33

Entire fairness is Delaware's most onerous standard of review. It applies when a plaintiff rebuts one or more of the presumptions of the business judgment rule. It also applies "[w]hen a transaction involving self-dealing by a controlling shareholder is challenged. . . ." *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1239 (Del. 2012). Unless the defendants implement protective procedural devices, they "bear the burden of proving that the transaction with the controlling stockholder was entirely fair to the minority stockholders." *Id.*

In the current case, the standard of review for evaluating the decision to continue paying interest on the Junior Notes is entire fairness with the burden of proof on the defendants. The Complaint alleges that the Board had the ability to defer interest payments on the Junior Notes, that the Junior Notes would not receive anything in an orderly liquidation, that EBF owned all of the Junior Notes, and that the Board decided not to defer paying interest on the Junior Notes to benefit EBF. A conscious decision not to take action is just as much of a decision as a decision to act. *See Hubbard v. Hollywood Park Realty Enters., Inc.*, 1991 WL 3151, at *10 (Del. Ch. Jan. 14, 1991) ("From a semantic and even legal viewpoint, 'inaction' and 'action' may be substantive equivalents, different only in form."); *accord Krieger v. Wesco Fin. Corp.*, 30 A.3d 54, 58 (Del. Ch. 2011). A decision to act and a conscious decision not to act are thus equally subject to review under traditional fiduciary duty principles. *See Spiegel*, 571 A.2d at 773-74 ("[A] conscious decision by a board of directors to refrain from acting may be a valid exercise of business judgment. . . ."); *Aronson*, 473 A.2d at 813 (equating "a conscious decision to refrain from acting" with a decision to act).

By virtue of the decision not to defer interest, funds flowed from the Company to EBF. As the owner of 100% of the Company's equity, EBF controlled the Company and stood on both sides of the transaction. Delaware law imposes fiduciary duties on those who effectively control a corporation.[9] When a controller owns 100% of a corporation's equity and the subsidiary is solvent, the interests of the corporation and its fiduciaries are fully aligned with those of the controller. The fiduciary duties of the directors and officers require that the subsidiary be managed for the benefit of the controller, and the fiduciary duties imposed on the controller self-referentially require the same thing. It is therefore accurate to say, when the subsidiary is solvent, that "in a parent and wholly-owned subsidiary context, the directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders." *Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1174 (Del. 1988).

A transfer of value from a solvent subsidiary to the holder of 100% of the equity cannot give rise to a fiduciary wrong. Before the transfer, the 100% stockholder owned

---

[9] *See Kahn v. Lynch Commc'n Sys. Inc.*, 638 A.2d 1110, 1114 (Del. 1994) (holding that 43% stockholder that exercised actual control over subsidiary could be liable for breach of fiduciary duty); *Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 109-10 (Del. 1952) (citing "the settled rule of law that Hilton as majority stockholder of Mayflower and the Hilton directors as its nominees occupy, in relation to the minority, a fiduciary position in dealing with Mayflower's property"); *Keenan v. Eshleman*, 2 A.2d 904, 908 (Del. 1938) (affirming imposition of liability on directors for management fees paid by corporation to second corporation that was its controlling stockholder, where directors also controlled the controlling stockholder; "The conception of corporate entity is not a thing so opaque that it cannot be seen through; and, viewing the transaction as one between corporations, casual scrutiny reveals that the appellants, in fact, dealt with themselves to their own advantage and enrichment. The employment of Consolidated by Sanitary was merely the employment by the appellants of themselves to do what it was their plain duty to do as officers of Sanitary."); *accord S. Pac. Co. v. Bogert*, 250 U.S. 483, 487-88 (1919) (imposing fiduciary duties on controlling stockholder).

the value indirectly and beneficially. After the transfer, the 100% stockholder owned the value directly. The sole residual claimant and exclusive beneficiary of the duties that the corporate fiduciaries owe is in the same position before and after the transaction. The sole residual claimant has not been harmed, and the transfer by every measure is entirely fair. But "[w]hen a corporation is *insolvent, . . .* its creditors take the place of the shareholders as the residual beneficiaries of any increase in value." *Gheewalla*, 930 A.2d at 101 (emphasis in original). Directors continue to have an obligation to maximize the value of the firm, but now a transfer of value to the sole stockholder does not inure to the ratable benefit of all of the residual claimants. The payment now transfers value previously owned beneficially and indirectly by all of the residual claimants to the party in control of the corporation.

Delaware courts have held that challenges to similar transfers from an insolvent subsidiary to its controller state a derivative claim for breach of fiduciary duty. In *Shandler v. DLJ Merchant Banking, Inc.*, 2010 WL 2929654 (Del. Ch. July 26, 2010), Chief Justice Strine, writing as a Vice Chancellor, held that a bankrupt corporation could sue its controlling stockholder and the directors affiliated with the controlling stockholder for breaching their fiduciary duty of loyalty by approving a transaction in which the corporation sold a business unit to an affiliate of its controlling stockholder. *Id.* at *1, *12. Similarly in *Production Resources*, then-Vice Chancellor Strine held that a complaint's allegations about specific transfers between an insolvent corporation and its *de facto* controller pled non-exculpated derivate claims, including allegations about payments to companies owned by the *de facto* controller. 863 A.2d at 777, 799-800.

36

Older authorities support the ability of a derivative-action plaintiff to challenge specific transfers as a breach of fiduciary duty. For example, Chancellor Wolcott stated that "[i]f an insolvent corporation should undertake to turn its assets over to stockholders, leaving creditors unpaid, I think no dissent can be found to the proposition that the law would condemn the effort." *Asmussen v. Quaker City Corp.*, 156 A. 180, 181 (Del. Ch. 1931). Subsequently, in *Pennsylvania Co. for Insurance on Lives and Granting Annuities v. South Broad St. Theater Co.*, 174 A. 112 (Del. Ch. 1934), Chancellor Wolcott held that an indenture trustee who sued on behalf of bondholders stated claim for breach of duty against an insolvent corporation's board of directors that made a preferential transfer to an entity affiliated with the corporation's controlling stockholder. *Id.* at 115-16.

Based on these authorities, Counts I and II state a derivative claim for breach of fiduciary duty to the extent they challenge the failure to defer interest on the Junior Notes. The defendants will have the burden of proving that the failure to defer interest on the Junior Notes was entirely fair.

### 5. The Derivative Claim For Paying Excessive Fees Under The Services Agreement And Software License

The second act identified in Counts I and II as a breach of fiduciary duty is the Company's payment of excessive service and license fees to ASIA. These allegations state a claim, and the analysis parallels the explanation regarding the Junior Notes. The Complaint alleges that EBF, the Company's controller, owns ASIA, and that the payment of service and license fees to ASIA diverts value from the Company to EBF. Compl. ¶ 80. The Complaint alleges that the fees that the Company is paying exceed market rates.

*Id.* ¶¶ 85-87. EBF stands on both sides of the transaction, making entire fairness the governing standard of review with the burden of proof on the defendants.

### 6.     The Challenge To The Board's Risk-On Business Strategy

In their third variation, Counts I and II allege that the defendants breached their fiduciary duties by amending the Operating Guidelines to permit Athilon to invest in riskier securities and make speculative investments. Quadrant alleges that EBF benefits from this strategy because it will enjoy the upside if the strategy succeeds while suffering none of the downside if the strategy fails. Given the Company's insolvency, Quadrant alleges that faithful fiduciaries would pursue a conservative strategy and prepare for liquidation. In effect, this aspect of Counts I and II asserts a variant of *Bovay*'s trust fund doctrine. In my view, this aspect of Count I and II does not state a claim.

Current Delaware law does not require the Board to shut down Athilon's business and manage towards a near-term dissolution for the benefit of creditors. Notwithstanding a company's insolvency, "[t]he directors continue to have the task of attempting to maximize the economic value of the firm." *Prod. Res.*, 863 A.2d at 791.

> Even when a firm is insolvent, its directors may, in the appropriate exercise of their business judgment, take action that might, if it does not pan out, result in the firm being painted in a deeper hue of red. The fact that the residual claimants of the firm at that time are creditors does not mean that the directors cannot choose to continue the firm's operations in the hope that they can expand the inadequate pie such that the firm's creditors get a greater recovery. By doing so, the directors do not become a guarantor of success.

*Trenwick*, 906 A.2d at 174. "Even when the firm is insolvent, directors are free to pursue value maximizing strategies, while recognizing that the firm's creditors have become its

38

residual claimants." *Id.* at 175. "If the board of an insolvent corporation, acting with due diligence and good faith, pursues a business strategy that it believes will increase the corporation's value, . . . it does not become a guarantor of that strategy's success." *Id.* at 205. "Rather, in such a scenario the directors are protected by the business judgment rule." *Id.*; *accord Shandler*, 2010 WL 2929654, at *14. At the same time, Delaware law also recognizes that:

> [t]he maximization of the economic value of the firm might, in circumstances of insolvency, require the directors to undertake the course of action that best preserves value in a situation when the procession of the firm as a going concern would be value-destroying. In other words, the efficient liquidation of an insolvent firm might well be the method by which the firm's value is enhanced in order to meet the legitimate claims of its creditors.

*Prod. Res.*, 863 A.2d at 791 n.60. Here too the business judgment rule would protect a board's decision to pursue an efficient liquidation.

Quadrant does not appear to dispute that the business judgment rule could apply to the Board's decisions. Instead, Quadrant argues that the Board's risk-on business strategy will favor EBF and disfavor the Company's creditors because of their relative positions in the Company's capital stack. Quadrant contends that because EBF controls the Company, the defendants have the burden to prove that their decision to pursue a riskier strategy was entirely fair to the Company.

In a sense, this argument can be conceived of as a reverse-*Trados* theory. In *Trados*, this court examined the decision by a board of directors to enter into a merger agreement that triggered special rights held by preferred stockholders to receive a liquidation preference. *See Trados I*, 2009 WL 2225958, at *8 (treating directors as

39

interested for pleading purposes in transaction that benefited preferred stockholders when

"each had an ownership or employment relationship with an entity that owned Trados

preferred stock"). Three of the directors on the board faced the dual-fiduciary problem

that the Delaware Supreme Court identified in *Weinberger v. UOP, Inc.*, 457 A.2d 701,

710 (Del. 1983), where the Delaware Supreme Court held that there "[t]here is no

dilution of [fiduciary] obligation where one holds dual or multiple directorships." *Id.* If

the interests of the beneficiaries to whom the dual fiduciary owes duties are aligned, then

there is no conflict of interest. *See, e.g.*, *Van de Walle v. Unimation, Inc.*, 1991 WL

29303, at *11 (Del. Ch. Mar. 7, 1991). But if the interests of the beneficiaries diverge, the

fiduciary faces an inherent conflict of interest.[10] "There is no 'safe harbor' for such

divided loyalties in Delaware." *Weinberger*, 457 A.2d at 710.

---

[10] *See Krasner v. Moffett*, 826 A.2d 277, 283 (Del. 2003) ("[T]hree of the FSC directors . . . were interested in the MEC transaction because they served on the boards . . . of both MOXY and FSC."); *McMullin v. Beran*, 765 A.2d 910, 923 (Del. 2000) ("The ARCO officers and designees on Chemical's board owed Chemical's minority shareholders 'an uncompromising duty of loyalty.' There is no dilution of that obligation in a parent subsidiary context for the individuals who acted in a dual capacity as officers or designees of ARCO and as directors of Chemical." (footnote omitted) (internal quotation marks omitted)); *Rabkin v. Philip A. Hunt Corp.*, 498 A.2d 1099, 1106 (Del. 1985) (holding that parent corporation's directors on subsidiary board faced conflict of interest); *Weinberger*, 457 A.2d at 710 (holding that officers of parent corporation faced conflict of interest when acting as subsidiary directors regarding transaction with parent); *see also Rales*, 634 A.2d at 933 (explaining for purposes of demand futility that "'[d]irectorial interest exists whenever divided loyalties are present'" (quoting *Pogostin v. Rice*, 480 A.2d 619, 623 (Del. 1984)); *Goldman v. Pogo.com, Inc.*, 2002 WL 1358760, at *3 (Del. Ch. June 14, 2002) ("Because Khosla and Wu were the representatives of shareholders which, in their institutional capacities, are both alleged to have had a direct financial interest in this transaction, a reasonable doubt is raised as to Khosla and Wu's disinterestedness in having voted to approve the . . . [l]oan."); *Sealy Mattress Co. of N.J., Inc. v. Sealy, Inc.*, 532 A.2d 1324, 1336 (Del. Ch. 1987) (same).

40

In a solvent corporation, the standard of conduct for directors requires that they act as fiduciaries "to promote the value of the corporation for the benefit of its stockholders."[11] The dual-fiduciary problem arises in a solvent corporation when directors face a conflicting fiduciary interest that diverges from promoting the value of the corporation for the benefit of the undifferentiated equity. In *Trados*, the interests of the directors' affiliated entities diverged from the interests of the common stockholders because those entities owned preferred stock with special rights. The directors consequently faced a conflict of interest and had to establish that their decision to approve a merger that triggered the preferred stock's special rights was entirely fair. *See Trados I*, 2009 WL 2225958, at *8.

As Quadrant sees it, when a corporation is insolvent, creditors become the principal residual claimants. This means that directors who are also fiduciaries for a sole or controlling stockholder, or even a large common holder, face the dual-fiduciary problem in a context where the interests of the primary residual claimants (the creditors) diverge from those of the equity. In a reverse of the situation in *Trados*, the duty of loyalty to the common stockholders creates the conflict. If a director held a material

---

[11] *eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 34 (Del. Ch. 2010); *accord Gheewalla*, 930 A.2d at 101 ("The directors of Delaware corporations have the legal responsibility to manage the business of a corporation for the benefit of its shareholder[ ] owners."); *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 955 (Del. 1985) (citing "the basic principle that corporate directors have a fiduciary duty to act in the best interests of the corporation's stockholders"); *see also* Leo E. Strine, Jr. et al., *Loyalty's Core Demand: The Defining Role of Good Faith in Corporation Law*, 98 Geo. L.J. 629, 634 (2010) ("[I]t is essential that directors take their responsibilities seriously by actually trying to manage the corporation in a manner advantageous to the stockholders.").

amount of common stock, the same argument would apply, although due to the director's personal financial interest rather than because of the dual-fiduciary problem.

The fault in this reasoning lies not in the theory, but in its application to business decisions that generally affect the value of the entity as a whole and which do not confer specific benefits on the directors themselves or, in dual-fiduciary situations, on the competing beneficiaries of fiduciary duties. When there are direct and specific benefits, the theory applies, as exemplified by cases like *Shandler* and *Production Resources* that have applied the entire fairness test to decisions approving transfers from an insolvent entity to its equity holders, and by this decision's analysis of the continued payments on the Junior Notes and the service and license fees. *See* Parts II.A.4 & 5, *supra*. But when directors make decisions that appear rationally designed to increase the value of the firm as a whole, Delaware courts do not speculate about whether those decisions might benefit some residual claimants more than others.

For solvent corporations, a similar principle can be seen in decisions holding that equal treatment of stockholders operates as a presumptive safe harbor for corporate fiduciaries, including controlling stockholders and directors, even when those fiduciaries allegedly have divergent economic interests. In *Sinclair Oil Corp. v. Levien*, 280 A.2d 717 (Del. 1971), minority stockholders established at trial that all of the directors of a 97%-owned subsidiary were dual-fiduciaries who also served as directors, officers, or employees of the parent or other parent-controlled entities. *Id.* at 719. The plaintiffs showed that "[f]rom 1960 through 1966, Sinven paid out $108,000,000 in dividends ($38,000,000 in excess of Sinven's earnings during the same period)," and the Court of

42

Chancery found that "Sinclair caused these dividends to be paid during a period when it had a need for large amounts of cash." *Id.* at 720-21. The plaintiffs argued that the dividends were paid with the bad faith motive of furthering the parent's need for cash rather than the best interests of all stockholders. The Court of Chancery applied the entire fairness test and held that the defendants had not met the test. *Id.* at 721.

On appeal, the Delaware Supreme Court reversed. In doing so, the high court distinguished between situations involving differential treatment of the controlling stockholder and situations involving equal treatment.

> We do not accept the argument that the intrinsic fairness test can never be applied to a dividend declaration by a dominated board, although a dividend declaration by a dominated board will not inevitably demand the application of the intrinsic fairness standard. If such a dividend is in essence self-dealing by the parent, then the intrinsic fairness standard is the proper standard. For example, suppose a parent dominates a subsidiary and its board of directors. The subsidiary has outstanding two classes of stock, X and Y. Class X is owned by the parent and Class Y is owned by minority stockholders of the subsidiary. If the subsidiary, at the direction of the parent, declares a dividend on its Class X stock only, this might well be self-dealing by the parent. It would be receiving something from the subsidiary to the exclusion of and detrimental to its minority stockholders. This self-dealing, coupled with the parent's fiduciary duty, would make intrinsic fairness the proper standard by which to evaluate the dividend payments.

> Consequently it must be determined whether the dividend payments by [the subsidiary] were, in essence, self-dealing by [the parent]. The dividends resulted in great sums of money being transferred from [the subsidiary] to [the parent]. However, a proportionate share of this money was received by the minority shareholders of [the subsidiary]. [The parent] received nothing from [the subsidiary] to the exclusion of its minority stockholders. As such, these dividends were not self-dealing. We hold therefore that the Chancellor erred in applying the intrinsic fairness test as to these dividend payments. The business judgment standard should have been applied.

*Id.* at 721-22 (citations omitted).

43

More recent Delaware cases have applied *Sinclair* in cases involving solvent corporations, while recognizing that equal treatment is not an absolute safe harbor. A fiduciary's personal motives for a transaction can give rise to a breach of duty of the duty of loyalty in the form of a violation of the requirement to act in good faith, which is "a subsidiary element, *i.e.,* a condition, of the fundamental duty of loyalty." *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006) (internal quotation marks omitted). "A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation."[12] "[A] range of human motivations . . . can inspire fiduciaries and their advisors to be less than faithful to their contextual duty to pursue the best value for the company's stockholders." *In re El Paso Corp. S'holder Litig.*, 41 A.3d 432, 439 (Del. Ch. 2012) (Strine, C.). "Greed is not the only human emotion that can pull one from the path of propriety; so might hatred, lust, envy, revenge, . . . shame or pride. Indeed any human emotion may cause a director to place his own interests, preferences or appetites

_____

[12] *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 67 (Del. 2006); *accord Stone*, 911 A.2d at 369 ("A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation . . . ."); *see Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1051 n.2 (Del. Ch. 1996) (Allen, C.) (defining a "bad faith" transaction as one "that is authorized for some purpose *other than* a genuine attempt to advance corporate welfare or is *known to constitute* a violation of applicable positive law") (emphasis in original); *In re RJR Nabisco, Inc. S'holders Litig.*, 1989 WL 7036, at *15 (Del. Ch. Jan. 31, 1989) (Allen, C.) (explaining that the business judgment rule would not protect "a fiduciary who could be shown to have caused a transaction to be effectuated (even one in which he had no financial interest) for a reason unrelated to a pursuit of the corporation's best interests").

before the welfare of the corporation."[13] It is not enough, however, for a plaintiff simply to argue in the abstract that a particular director has a conflict of interest or is acting in bad faith because she is affiliated with a particular type of institution that may be pursuing a particular business strategy or have a particular interest. There must be specific allegations and later, actual evidence sufficient to permit a finding that the director faced a conflict or acted with an improper purpose on the facts of the case.[14]

---

[13] *RJR Nabisco*, 1989 WL 7036, at *15. For example, Delaware cases recognize that a need for liquidity "may lead directors to breach their fiduciary duties." *In re Answers Corp. S'holder Litig. (Answers I)*, 2012 WL 1253072, at *7 (Del. Ch. Apr. 11, 2012); *see McMullin v. Beran*, 765 A.2d 910, 922-23 (Del. 2000) (reversing grant of motion to dismiss where complaint alleged that controlling stockholder and its director designees sacrificed value in a sale to achieve controlling stockholder's goal of obtaining near-term liquidity and significant component of the transaction consideration in cash); *N.J. Carpenters Pension Fund v. Infogroup, Inc.*, 2011 WL 4825888, at *4, *9-10 (Del. Ch. Sept. 30, 2011) (denying motion to dismiss where the plaintiff alleged that the director who was also a large stockholder sacrificed value in sale because he needed liquidity to satisfy personal debts and fund a new venture); *In re TeleCorp PCS, Inc. S'holders Litig.*, Cons. C.A. No. 19260-VCS, at 16 (Del. Ch. June 17, 2002) (TRANSCRIPT) (Strine, V.C.) ("What [these large stockholders] weren't entitled to do was to use their influence as fiduciaries to procure liquidity from AT&T Wireless on the backs of public stockholders in an unfair merger."); *see also In re S. Peru Copper Corp. S'holder Deriv. Litig.*, 52 A.3d 761, 780 (Del. Ch. 2011) (Strine, C.) (considering large stockholder's desire for liquidity when evaluating performance of affiliated special committee member as part of assessment of entire fairness of transaction with controller; stating "Although I am not prepared on this record to find that Handelsman consciously agreed to a suboptimal deal for Southern Peru simply to achieve liquidity for Cerro from Grupo Mexico, there is little doubt in my mind that Cerro's own predicament as a stockholder dependent on Grupo Mexico's whim as a controller for registration rights influenced how Handelsman approached the situation."), *aff'd sub nom Americas Mining v. Therault*, 51 A.3d 1213 (Del. 2012).

[14] *See In re Morton's Rest. Gp., Inc. S'holders Litig.*, 74 A.3d 656, 667 (Del. Ch. 2013) (Strine, C.) (dismissing complaint challenging sale that was the product of a lengthy and thorough pre-signing market check in which plaintiff conceded that "all logical buyers were made aware . . . and that they all had the time and fair opportunity to bid" and rejecting allegation that private equity firm "typically flips companies it invests in every three to five years" and favored a sale to achieve liquidity for the investors in one of its funds and to invest in a new fund); *Trados II*, 73 A.3d at 54 ("At trial, the plaintiff could not rely on general characterizations of the VC ecosystem. The plaintiff had to prove by a preponderance of

Cases like *Shandler*, *Production Resources*, *Trenwick,* and *Gheewalla* treat decisions that benefit the firm as a whole similarly, thereby rejecting the proposition that a plaintiff can rebut the business judgment rule as to matters of ongoing business strategy by alleging that the directors own material amounts of common stock, or are dual-fiduciaries who owe competing duties to a large equity holder or even a sole or controlling stockholder. In *Shandler*, then-Vice Chancellor Strine dismissed a claim that director-defendants affiliated with a controlling stockholder breached their fiduciary duties by causing an insolvent corporation "to take a reckless and value-destroying gamble so as to provide a chance for [the controlling stockholder] to recoup value for its . . . equity." 2010 WL 2929654, at *13. The Chief Justice explained that "the mere fact that the company was not able to avoid ultimate insolvency does not, in itself, mean that there was not a good faith basis to take a chance on survival if the board viewed that as the best option to maximize [the insolvent entity's] value." *Id.* at *14 n.127. Although a majority of the directors were employees of the controlling stockholder, the Chief Justice held that "[e]ven when [the entity] was insolvent, the board was entitled to exercise a good faith business judgment to continue to operate the business if it believed that was what would maximize [the entity's] value." *Id.* at *14. The decision affected the value of

evidence that Prang was not disinterested or independent in this case."); *In re Synthes, Inc. S'holder Litig.*, 50 A.3d 1022, 1036 (Del. Ch. 2012) (Strine, C.) (applying general rule of equal treatment where controlling stockholder received same consideration as minority in third party sale to dismiss challenge to transaction; recognizing there could be "very narrow circumstances in which a controlling stockholder's immediate need for liquidity could constitute a disabling conflict of interest irrespective of pro rata treatment" but rejecting liquidity-based interest given lack specific allegations in complaint).

the entity as a whole and did not confer any direct or specific benefits on a fiduciary, a party affiliated with a fiduciary, or on a particular class of residual claimants. Neither the directors' affiliation with the controller, nor the allegation that the controller benefitted generally from continuing to operate the business was sufficient to rebut the business judgment rule and elevate the standard of review to entire fairness.

In *Production Resources*, again writing as a Vice Chancellor, Chief Justice Strine considered claims that the directors and officers of Production Resources Group, L.L.C. ("PRG"), an insolvent entity, were operating the company for the benefit of Carole Salkind, the company's *de facto* controlling stockholder. 863 A.2d at 775, 781. Two of the four directors were members of management, earned substantial salaries, and were deemed beholden to Salkind. The complaint alleged specific transfers of value to Salkind, but also alleged that PRG's board and officers had acted improperly by continuing to operate the firm for Salkind's benefit. Notwithstanding the presence of a controlling stockholder and the absence of a disinterested and independent board majority, Chief Justice Strine treated the claims regarding the continued operation of the firm as breaches of the duty of care for which the defendants were exculpated. *Id.* at 776-77, 793. Here too, the decision to continue operating affected the entity as a whole. In a footnote, the Chief Justice Strine expressed doubt that:

> there is a magic dividing line that should signal the end to some, most, or all risk-taking on behalf of stockholders or even on behalf of creditors, who are not homogenous and whose interests may not be served by a board that refuses to undertake any further business activities that involve risk. As a result, the business judgment rule remains important and provides directors with the ability to make a range of good faith, prudent judgments about the risks they should undertake on behalf of troubled firms.

47

*Id.* at 788 n.52. By contrast, as noted previously, the Chief Justice held that the complaint's challenges to specific transactions with Salkind pled non-exculpated derivative claims, including regarding payments to Salkind's family companies, the payment of hefty salaries to insiders, the continued subordination of other creditors to Salkind, and the issuance of excessive shares to Salkind beyond the number authorized by the company charter. *Id.* at 777, 799-800.

In *Trenwick*, then-Vice Chancellor Strine did not actually rule on the viability of derivative claims asserted by a litigation trustee appointed in a bankruptcy proceeding, because he held that the complaint had not adequately pled facts supporting a rational inference that the subsidiary on whose behalf the plaintiff sought to assert the claims was insolvent. 906 A.2d at 195. The litigation trustee had sought to sue the subsidiary's sole stockholder in its capacity as the subsidiary's controller and the members of the subsidiary's board, all of whom were executive officers of the parent. *Id.* at 200. In an extensive footnote, the Chief Justice explained that the business judgment rule would protect the business decisions made by the board of an insolvent firm.

> [W]hen a corporation is solvent, the notion that the directors should pursue the best interests of the equityholders does not prevent them from making a myriad of judgments about how generous or stingy to be to other corporate constituencies in areas where there is no precise legal obligation to those constituencies. I do not understand this complexity to diminish when a firm is insolvent simply because the residual claimants are now creditors.

*Id.* at 195 n.75. The complaint had alleged dual-fiduciary status on the part of all of the subsidiary directors, so if entire fairness applied simply because (i) the directors of the insolvent corporation were dual fiduciaries and (ii) the complaint alleged that the board

chose a riskier business strategy to benefit its sole equityholder, it seems likely that the Chief Justice would have mentioned it. Instead, he spoke consistently in terms of the business judgment rule as the operating standard of review.

Finally, to hold otherwise and treat directors as interested in pursuing a riskier business decision that allegedly benefitted the equity holder such that the standard of review would escalate to entire fairness would be inconsistent with the explanation the Delaware Supreme Court gave in *Gheewalla* for declining to recognize the existence of fiduciary duties owed directly to creditors.

> Recognizing that directors of an insolvent corporation owe direct fiduciary duties to creditors, would create uncertainty for directors who have a fiduciary duty to exercise their business judgment in the best interest of the insolvent corporation. To recognize a new right for creditors to bring direct fiduciary claims against those directors would create a conflict between those directors' duty to maximize the value of the insolvent corporation for the benefit of all those having an interest in it, and the newly recognized direct fiduciary duty to individual creditors.

930 A.2d at 103. If a creditor-plaintiff could sue derivatively and establish a lack of director independence and disinterestedness by alleging that the director who owned equity or who owed duties to a large stockholder adopted a risky business strategy to benefit the common stock, the directors of an insolvent corporation would face precisely the same type of fiduciary conflict that *Gheewalla* sought to avoid.

Given these authorities, I do not believe that Quadrant can rebut the business judgment rule by alleging that the Board has decided to pursue a relatively more risky business strategy to benefit its sole common stockholder, EBF. Although the Company is insolvent, and although the directors are dual-fiduciaries, the Board does not face a

49

conflict between the interests of the primary residual claimants (the creditors) and the interests of secondary residual claimants (the stockholders). The fact that Vertin is a principal of EBF and Sullivan is an employee of EBF makes their dual-fiduciary status all the more readily apparent, but it does not alter the analysis. Under this court's precedents, the directors are not deemed conflicted on the theory that a riskier business strategy will benefit EBF and harm Athilon's creditors.

As an alternative basis for rebutting the business judgment rule, Quadrant makes the more traditional argument that the Complaint alleges facts supporting an "inference that rational persons acting in good faith as the directors of an insolvent firm would not proceed in this manner." *Prod. Res.*, 863 A.2d at 800. The Complaint does not support an inference that no rational person would take on additional risk in the form of potentially higher yielding investments. Depending on the nature of the investments, a riskier strategy could return greater value for the Company and all of its residual claimants, including its creditors. The Complaint does not contain sufficient allegations to call into question the rationality of a riskier investment approach.

### 7. Waste

Counts I and II also contend that the foregoing actions constitute waste. "That the complaint states a loyalty claim does not mean that it also states a claim for waste." *In re The Student Loan Corp. Deriv. Litig.*, 2002 WL 75479, at *4 (Del. Ch. Jan. 8, 2002) (Strine, V.C.). "The pleading burden on a plaintiff attacking a corporate transaction as wasteful is necessarily higher than that of a plaintiff challenging a transaction as 'unfair' as a result of the directors' conflicted loyalties. . . ." *Harbor Fin. P'rs v. Huizenga*, 751

50

A.2d 879, 892 (Del. Ch. 1999) (Strine, V.C.). For a waste claim to survive a motion to dismiss, a plaintiff must show "economic terms so one-sided as to create an inference that no person acting in a good faith pursuit of the corporation's interests could have approved the terms." *Sample v. Morgan*, 914 A.2d 647, 670 (Del. Ch. 2007) (Strine, V.C.).

Counts I and II do not state claims for waste to the extent they challenge the Board's alleged risk-on business strategy. As stated in the previous section, a rational person could choose to take on greater risk with the goal of achieving greater return.

By contrast, Counts I and II state claims for waste to the extent they challenge the non-deferral of interest on the Junior Notes and the excessive fees paid under services agreement and software license. According to the Complaint, the Board could have charted a course that would result in the Company never having to pay anything to EBF as the sole holder of Junior Notes, making the non-deferral of interest an act of beneficence. Whether that proves to be the case will be determined at a later stage. If the Complaint's theory is correct, then it is reasonably conceivable that the non-deferral of interest could constitute waste. Similarly, the excessive fees could fall so far beyond market standards as to amount to waste. While that seems improbable, it is reasonably conceivable.

As a practical matter, it is unlikely that waste will be a relevant theory of relief. It is hard to conceive of a situation where the challenged transactions would not constitute a breach of fiduciary duty, but would constitute waste. Conversely, if the challenged transactions are found to constitute a breach of fiduciary duty, then the waste claim

51

becomes superfluous. Nevertheless, as a strict pleading matter, the waste claims can proceed.

### 8. The Present Inability To Apply Section 102(b)(7)

For the reasons stated, Counts I and II state well-pled claims for breach of fiduciary duty and waste to the extent they challenge the non-deferral of interest payments on the Junior Notes and the payment of excessive fees for services and software. The defendant directors seek dismissal of these claims on the ground that they are exculpated from liability by a provision in the Athilon Charter. *See* 8 *Del. C.* § 102(b)(7). Three of the directors cannot invoke Section 102(b)(7) because the Complaint pleads that they were not independent of EBF. For the other two directors, the court cannot now determine whether they are entitled to exculpation.

Section 102(b)(7) authorizes the certificate of incorporation of a Delaware corporation to eliminate or limit "the personal liability of a director *to the corporation* or its stockholders for monetary damages for breach of fiduciary duty," subject to enumerated exceptions. *Id.* (emphasis added). When creditors assert derivative claims for breach of fiduciary duty, they are seeking to impose personal liability on directors of the corporation, so Section 102(b)(7) potentially applies. *Prod. Res.*, 863 A.2d at 793-95.

Because EBF is interested in the payment of interest on the Junior Notes, the Complaint sufficiently pleads that Vertin, Sullivan, and Gonzalez lacked independence from EBF. A plaintiff may allege a lack of independence by pleading facts showing that directors depend on an interested controller for their income or employment. *See Student Loan Corp.*, 2002 WL 75479, at *3 n.3 ("[T]he remuneration a person receives from her

full-time job is typically of great consequence to her."); *see also Shandler*, 2010 WL 2929654, at \*12 (finding that complaint pled duty of loyalty claim against director-defendants who "derived their primary source of income" by working for controller and who approved an interested transaction with the controller).

The Complaint alleges that Vertin is an EBF partner and that his compensation is tied to the performance of EBF's investments in credit derivative product companies. Compl. ¶ 7. The Complaint alleges that Sullivan is an attorney employed by EBF and depends on EBF for his primary source of income. *Id.* ¶ 8. The Complaint alleges that Gonzalez is the CEO of Athilon and depends on EBF for his position and primary source of income. *Id.* ¶ 9. These allegations are sufficient to call into question the independence of Vertin, Sullivan, and Gonzalez, rendering exculpation under Section 102(b)(7) potentially unavailable and resulting in the denial of the motion to dismiss as to these defendants.

The Complaint does not plead facts that would be sufficient to rebut the business judgment rule as to Jundt and Wagoner. In a transaction governed by the business judgment rule, the plaintiff has the burden at the pleadings stage to allege facts sufficient to rebut the presumptions of loyalty and good faith that protect the directors. Absent well pled facts supporting a breach of the duty of loyalty, a court can apply Section 102(b)(7) summarily at the pleadings stage. *Malpiede v. Townson*, 780 A.2d 1075, 1094-96 (Del. 2001); *see Emerald P'rs v. Berlin (Emerald II)*, 787 A.2d 85, 90 (Del. 2001) (describing *Malpiede* as addressing the proper application of a Section 102(b)(7) provision "in a

53

pretrial procedural context, when the applicable standard of judicial review was the business judgment rule.").

The claims that have survived are not governed by the business judgment rule. Under controlling Delaware Supreme Court precedent, entire fairness governs interested transactions between a corporation and its controller, even if a special committee of independent directors *or* a majority-of-the-minority vote is used, because of the risk that when push comes to shove, directors who appear to be independent and disinterested will favor or defer to the interests and desires of the majority stockholder. *See Lynch*, 638 A.2d at 1116-17.

> In colloquial terms, the Supreme Court saw the controlling stockholder as the 800–pound gorilla whose urgent hunger for the rest of the bananas is likely to frighten less powerful primates like putatively independent directors who might well have been hand-picked by the gorilla (and who at the very least owed their seats on the board to his support).

*In re Pure Res., Inc., S'holders Litig.*, 808 A.2d 421, 436 (Del. Ch. 2002) (Strine, V.C.). Particularly in controlling stockholder transactions, there is the risk that "that the outside directors might be more independent in appearance than in substance." *In re Cox Commc'ns, Inc. S'holders Litig.*, 879 A.2d 604, 619 (Del. Ch. 2005) (Strine, V.C.); *accord Kahn v. Tremont Corp. (Tremont I)*, 1996 WL 145452, at *7 (Del. Ch. Mar. 21, 1996) (Allen, C.) (noting that a controlling stockholder transaction "of course is the context in which the greatest risk of undetectable bias may be present"), *aff'd in pertinent part, rev'd on other grounds, Kahn v. Tremont Corp. (Tremont II)*, 694 A.2d 422 (Del. 1997).

The entire fairness test helps uncover situations where facially independent and disinterested directors have failed to act loyally and in good faith to protect the interests of the corporation and the stockholders as a whole and instead have given in to or favored the interests of the controller. *See Tremont II*, 694 A.2d at 428-29. By independently reviewing the procedural and substantive fairness of the transaction with the burden of proof on the defendant directors, the court can identify those situations and, if necessary, impose a remedy. *Id.* What this means for purposes of Section 102(b)(7) is that when a case involves a controlling stockholder with entire fairness as the standard of review, and when there is evidence of procedural and substantive unfairness, a court cannot summarily apply Section 102(b)(7) on a motion to dismiss to enter judgment in favor of facially independent and disinterested directors. Under those circumstances, it is not possible to hold as a matter of law that "the factual basis for [the] claim *solely* implicates a violation of the duty of care." *Emerald P'rs v. Berlin (Emerald I)*, 726 A.2d 1215, 1224 (Del. 1999) (emphasis in original). Rather, "the inherently interested nature of [the transaction becomes] inextricably intertwined with issues of loyalty." *Emerald II*, 787 A.2d at 93; *accord Tremont II*, 694 A.2d at 428 (explaining that in such a case, "the underlying factors which raise the specter of impropriety can never be completely eradicated and still require careful judicial scrutiny."). Depending on the results of discovery, the court potentially will need to conduct a trial, determine whether the transaction was entirely fair, and if not, "identify the breach or breaches of fiduciary duty upon which liability for damages will be predicated in the *ratio decidendi* of its determination that entire fairness has not been established." *Emerald II*, 787 A.2d at 94

55

(internal quotation marks omitted). Only then can the court conduct the director-by-director analysis necessary to determine who is exculpated from liability. *Id.* "The director defendants can avoid personal liability for paying monetary damages only if they have established that their failure to withstand an entire fairness analysis is exclusively attributable to a violation of the duty of care." *Id.* at 98. The burden of making this showing in an entire fairness case "falls upon the director." *Emerging Commc'ns*, 2004 WL 1305745, at *40; *accord Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1165 (Del. Ch. 2006) ("[I]n an entire fairness case where the court has found that a challenged transaction is not entirely fair, a director seeking to rely on the exculpatory provision must show that any liability of his is exclusively attributable to a violation of the duty of care." (internal quotation marks omitted)).

There are no indications in this case that the defendants deployed any procedural protections to limit the influence of EBF and its representatives on the Board over the challenged decisions regarding the non-deferral of interest on the Junior Notes or the excessive fees paid under the services agreement and software agreement from the influence of EBF. It is reasonably conceivable at this procedural stage that the alleged breaches of fiduciary duty that Jundt and Wagoner committed by making the challenged decisions were not "exclusively attributable to a violation of the duty of care," *Emerald II*, 787 A.2d at 98, making it reasonably conceivable that exculpation could be unavailable for these directors. The motion to dismiss is therefore denied as to Jundt and Wagoner as well.

**B.     Counts IV and V: Fraudulent Transfer**

In Counts IV and V, Quadrant asserts claims under the Delaware Uniform Fraudulent Transfer Act ("DUFTA") based on the non-deferral of interest on the Junior Notes and the payment of excessive fees under the services agreement and software license agreement. In asserting its fraudulent transfer claims, Quadrant relies on Section 1304 of DUFTA, which provides a cause of action to both present and future creditors. Quadrant also relies on Section 1305 of DUFTA, which provides a cause of action only to present creditors.

Section 1304(a) identifies two grounds on which a transfer could be fraudulent as to both present and future creditors. Quadrant relies only on the first ground, set forth in Section 1304(a)(1), which states:

> (a)     A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (1)     With actual intent to hinder, delay or defraud any creditor of the debtor . . . .

6 *Del. C.* § 1304(a)(1). Section 1304(b) of DUFTA identifies a non-exclusive list of factors for a court to consider when evaluating "actual intent." They include whether:

> (1)     The transfer or obligation was to an insider;
>
> (2)     The debtor retained possession or control of the property transferred after the transfer;
>
> (3)     The transfer or obligation was disclosed or concealed;
>
> (4)     Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) The transfer was of substantially all the debtor's assets;

(6) The debtor absconded;

(7) The debtor removed or concealed assets;

(8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*Id.* § 1304(b).

Section 1305 identifies two additional grounds on which a transfer could be fraudulent as to present creditors. Quadrant relies only on both. Section 1305(a) states that:

> [a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

*Id.* § 1305(a). Section 1305(b) states that "[a] transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time and the insider had reasonable cause to believe that the debtor was insolvent." *Id.* § 1305(b).

1. **The Interest Payments On The Junior Notes**

Quadrant challenges the non-deferral of interest payments on the Junior Notes under Section 1304(a)(1) and Section 1305(b). Both theories state claims.

### a. Section 1305(b)

Taking the theories in reverse order, a cause of action under Section 1305(b) will exist if (i) the transfer flowed from a debtor to an insider, (ii) the debtor was insolvent at the time of the transfer, (iii) the insider had reasonable cause to believe that the debtor was insolvent, and (iv) the plaintiff was a creditor at the time of the transfer. The definition of "insider" includes "[a] person in control of the debtor." *Id.* § 1301(7). The Complaint adequately pleads that EBF controls Athilon through its 100% ownership of Athilon's equity, its two employees on the Board, and its influence over Athilon's CEO. The Complaint therefore adequately pleads that EBF is an insider and that the continued payment of interests on the Junior Notes constituted a transfer to an insider.

For purposes of DUFTA, a plaintiff can establish insolvency by showing that "the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation." *Id.* § 1302(a). This test is the same as Delaware's common law balance sheet test. For reasons previously discussed, the Complaint adequately pleads that Athilon is insolvent under the balance sheet test and has been since Lehman's bankruptcy and the onset of the financial crisis. *See* Part II.A.2., *supra*.

The Complaint contains allegations supporting a reasonable inference that EBF knew that Athilon was insolvent. Athilon had lost its AAA/Aaa ratings and been in runoff pursuant to its Operating Guidelines since at least 2009, before EBF acquired Athilon's equity in 2010. Compl. ¶ 54. EBF used this opportunity to purchase Athilon's

59

outstanding Junior Notes, which were trading at a steep discount. *Id.* ¶¶ 45, 46. When EBF later acquired control of 100% of Athilon's equity, Athilon had a negative net worth. *Id.* ¶ 48. When the Complaint was filed, Athilon had a sub-investment grade issuer credit rating of BB and a sub-investment grade counterparty credit rating of Ba1 from S&P and Moody's respectively. *Id.* ¶ 57. These allegations support the inference that EBF had reasonable cause to believe that Athilon was insolvent. Since acquiring control over Athilon, EBF has maintained representatives on its Board, giving EBF detailed insight into Athilon's financial performance. *See id.* ¶ 49.

Finally, the Complaint pleads that Quadrant has been a creditor "at all relevant times." Compl. ¶ 3. In an earlier version of the Complaint, Quadrant alleged that it became a creditor of Athilon in May 2011. Section 1305 only provides a cause of action to plaintiffs who were already creditors at the time of the transfer. The defendants read DUFTA as imposing the equivalent of a contemporaneous creditor requirement that would bar Quadrant from asserting claims that arose before it owned the notes.

The plain language of the statute, however, refers to the time when the claim arose, not when the party challenging the transfer acquired the claim. DUFTA defines a "claim" expansively as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." 6 *Del. C.* § 1301(3). The right to payment under the Notes arose when the Company issued them. The creditor referred to in the statute is simply the current holder of the claim. As long as the claim itself arose prior to the transfer, the current holder can be a transferee or assignee of the claim. "The

right to attack a conveyance as being in fraud of creditors is not personal to the original creditor, but may be exercised by his or her successors or assignees."[15]

Quadrant has a right to payment, which arose between 2004 and 2007 when the Notes were issued, not in 2011 when Quadrant purchased them. As a successor in interest to the original noteholders' claims, Quadrant has standing to assert fraudulent transfer claims under Section 1305(b). The defendants are correct that in light of the one year statute of limitations imposed for claims brought pursuant to Section 1305, Quadrant can only recover for transfers that occurred on or since October 28, 2010, one year before the filing of the Complaint. 6 *Del. C.* § 1309(3).

### b.    Section 1304(a)(1).

Quadrant also challenges the non-deferral of interest under Section 1304(a)(1). A cause of action under this section will exist if the transfer was made with "actual intent to delay, hinder or delay any creditor of the debtor." 6 *Del. C.* § 1304(a)(1). Intent is a question of fact. 37 C.J.S. Fraudulent Conveyances § 76. The Complaint must plead facts from which it is reasonably conceivable that the defendants acted with the requisite

---

[15] 37 C.J.S. Fraudulent Conveyances § 51; *see Interim Capital, LLC v. Chiangi*, 2010 WL 1793140, at *3 (Conn. Super. Ct. Mar. 31, 2010) (permitting assignee who acquired loan after allegedly fraudulent transfer to assert a fraudulent transfer claim); *Collin Cnty. Nat. Bank of McKinney v. Murphy*, 92 S.W.2d 491, 493 (Tex. Civ. App. 1936) ("Can the purchaser of a debt attack a conveyance as fraudulent, if the original owner of the debt could have done so? The overwhelming weight of authority answers this question in the affirmative."); *Brandon v. Faria*, 279 P. 192, 193 (1929) (holding that an assigned of a creditor could assert fraud in previous conveyance from husband to wife); *Nat'l Sur. Co. v. Fowler*, 114 So. 408, 408 (1927) (allowing appellants as assignees of the notes executed by defendant to the original creditors to maintain a fraudulent transfer suit).

intent. Section 1304(b) provides a non-exclusive list of indicia that can be considered for that purpose.

"In all averments of fraud . . . , the circumstances constituting fraud . . . shall be stated with particularity." Ch. Ct. Ch. R. 9(b). "Intent," however, "may be averred generally." *Id.* "Rule 9(b) does not require an exhaustive cataloguing of facts but only sufficient factual specificity to provide assurance that the plaintiff has investigated ... the alleged fraud and reasonably believes that a wrong has occurred." *Bernstein v. IDT Corp.*, 582 F. Supp. 1079, 1085 (D. Del. 1984) (internal quotation marks omitted). "The actual intent of the parties to the conveyance is of no consequence since [6 Del. Code § 1304] establishes an external test of constructive or legal fraud. . . ." *China Res. Prod. (U.S.A) Ltd. v. Fayda Int'l., Inc.*, 788 F. Supp. 815, 818 (D. Del. 1992) (internal quotation marks omitted). In order to state a fraudulent transfer claim, Quadrant must generally plead facts showing intent to defraud with specific supporting facts describing the circumstances of the transfer. *See Geyer*, 621 A.2d at 792 n.5.

The allegations of the Complaint adequately support a pleading stage inference of fraudulent intent. The Complaint alleges that EBF sought to deprive creditors, including Quadrant, of access to the Company's assets that would otherwise be available to satisfy their claims. Compl. ¶ 160. The Complaint further alleges that EBF knew that any transfers would have the effect of hindering and defrauding the Company's creditors. *Id.* The Complaint identifies several indicia of fraud, including (i) the Company's insolvency, (ii) EBF's insider status, and (iii) the lack of any need to continue paying interest on the Junior Notes. *Id.* ¶¶ 160, 165, 166.

## 2. The Service And License Fees

Quadrant challenges the service and license fees under Section 1304(a)(1), Section 1305(a), and Section 1305(b). All three theories state a claim. Much of the analytical work already has been done in connection with analyzing the continuing interest payments and applies equally to the service and license fees.

### a. Section 1305(b)

Proceeding again in reverse order, Quadrant challenges the service and license fees as fraudulent transfers in violation of Section 1305(b). To reiterate, a cause of action under Section 1305(b) will exist if (i) the transfer flowed from a debtor to an insider, (ii) the debtor was insolvent at the time of the transfer, (iii) the insider had reasonable cause to believe that the debtor was insolvent, and (iv) the plaintiff was a creditor at the time of the transfer. With one exception, the same analysis that governs these elements for purposes of the deferred interest payments applies to the service and license fees. The only difference is that the transfers flowed from the debtor to ASIA rather than directly to EBF. The question is therefore whether ASIA should be treated as an insider for pleading purposes.

Section 1301(7)(d) defines "insider" as "[a]n affiliate or an insider of an affiliate as if the affiliate were the debtor". 6 *Del. C.* § 1301(7)(d). Section 1301(1)(b) defines "affiliate" as:

> A corporation, 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled or held with power to vote by the debtor or a person who directly or indirectly owns, controls or holds with power to vote 20 percent or more of the outstanding voting securities of the debtor . . . .

*Id.* § 1301(1)(b). ASIA is an insider for purposes of Section 1305(b) because Quadrant has adequately alleged that ASIA is an affiliate of EBF. The Complaint alleges that ASIA is ultimately owned and indirectly controlled by EBF. Compl. ¶ 80. The Complaint further alleges that EBF owns 100% of Athilon's equity. *Id.* ¶ 48. As such, ASIA is "[a] corporation, 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled or held with power to vote by . . . [EBF] who directly or indirectly owns, controls or holds with power to vote 20 percent or more of the outstanding voting securities of [Athilon]." 6 *Del. C.* § 1301(1)(b). ASIA is, therefore, an insider for purposes of Section 1305(b), and Quadrant has stated a claim that payments which took place on or after October 28, 2010, constituted a fraudulent transfer in violation of Section 1305(b).

### b.    Section 1305(a)

Continuing in reverse order, a cause of action under Section 1305(a) will exist if (i) the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange, (ii) the debtor was insolvent at the time of or rendered insolvent by the transfer, and (iii) the plaintiff was a creditor at the time of the transfer. The same analysis that governed the issues of insolvency and creditor status continues to apply. The only question is whether the Complaint sufficiently alleges that Athilon did not receive "reasonably equivalent value" for the service and license fees.

The Complaint adequately alleges that Athilon did not receive reasonably equivalent value for its service fees transferred to ASIA. The Complaint alleges that, after

Athilon entered runoff mode, the scope of ASIA's services diminished yet ASIA's fee increased after the EBF takeover. Compl. ¶¶ 84-85. Athilon allegedly transferred $23.5 million in annual service fees to ASIA in 2010, which included a $2.5 million service fee paid directly to EBF. *Id.* ¶ 86. The Complaint alleges that these service fees exceed market rates of approximately $5-$7 million annually. *Id.* ¶¶ 87-88. The Complaint further alleges that the Board rejected Quadrant's offer to perform equivalent services for only $5 million per year and has continued to pay disproportionately high fees to ASIA. *Id.* ¶¶ 89, 91-92.

Similarly, the Complaint adequately alleges that Athilon did not receive reasonably equivalent value for the annual software license fee transferred to ASIA. The Complaint alleges that the annual software license fee increased from $1.25 million in 2009 to $1.5 million in 2010. ¶ 94. This annual fee allegedly exceeds the cost of contracting a third party to build software from scratch. ¶ 95. The disparity between the fees paid to ASIA and the value of the software license received by Athilon support an inference that Athilon did not receive reasonably equivalent value in return. Therefore, the Complaint states a claim that the payment of these fees constituted a fraudulent transfer in violation of Section 1305(a).

### c. Section 1304(a)(1).

Finally, a cause of action under Section 1304(a)(1) will exist if the transfer was made with "actual intent to delay, hinder or delay any creditor of the debtor." 6 *Del. C.* § 1304(a)(1). As noted, intent is a question of fact, so the Complaint must plead facts from which it is reasonably conceivable that the defendants acted with the requisite intent

when paying the service and license fees. In doing so, the Complaint may refer to the non-exhaustive list of factors enumerated in Section 1304(b) that support a finding of intent. *See id.* § 1304(b).

The Complaint states sufficient facts about the service and license fees paid to plead a claim. Quadrant alleges facts supporting an inference that the value of the services and software received by Athilon was not reasonably equivalent to the value of the fees it paid to ASIA. *See id.* § 1304(b)(8). Quadrant alleges that these fees far exceeded market pricing. Compl. ¶¶ 80-98, 159, 165-168. According to the Complaint, the annual market rate for service fees was $5-7 million, yet the Company paid $23.5 million. *Id.* ¶¶ 88-92. The Company also pays in excess $1 million to use ASIA's software when it could have built the models from scratch for less. *Id.* ¶¶ 94-95.

The Complaint pleads additional facts that speak to other factors indicating actual intent under Section 1304(b). Quadrant alleges facts showing that the service and license fees were paid to an insider by virtue of ASIA's affiliate status. *See* Part II.B.2.a., *supra*; 6 *Del. C.* § 1304(b)(1) ("[t]he transfer or obligation was to an insider"). Quadrant adequately pleads that Athilon is insolvent under the balance sheet test and has been since the financial crisis in 2008. *See* Part II.A.2., *supra*; 6 *Del. C.* § 1304(b)(9) ("[t]he debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred"). As such, Quadrant has stated a claim that Athilon's payment of service and license fees to ASIA constituted a fraudulent transfer in violation of Section 1304(a)(1).

66

## C.    Count IX: Constructive Dividends

Count IX of the Complaint alleges that the Company's payment of excessive service and license fees to ASIA constitute constructive dividends paid indirectly to EBF, its sole equity holder. Count IX alleges that because the dividends were paid while the Company was insolvent, the payments violated Sections 170 and 174 of the DGCL.[16] Section 170(a) requires that dividends be paid (i) out of surplus or (ii) "[i]n case there shall be no such surplus, out of its net profits for the fiscal year in which the dividend is declared and/or the preceding fiscal year." 8 *Del. C.* § 170. Section 174 makes directors personally liable for the declaration of an unlawful dividend "to the corporation, and to its creditors in the event of its dissolution or insolvency, to the full amount of the dividend unlawfully paid, or to the full amount unlawfully paid for the purchase or redemption of the corporation's stock, with interest from the time such liability accrued." *Id. C.* § 174(a). Delaware law does not recognize a claim for constructive dividends.

When evaluating claimed violations of the DGCL, Delaware law takes a formal and technical approach.

> As a general matter, those who must shape their conduct to conform to the dictates of statutory law should be able to satisfy such requirements by satisfying the literal demands of the law rather than being required to guess about the nature and extent of some broader or different restriction at the risk of an ex post facto determination of error. The utility of a literal approach to statutory construction is particularly apparent in the

---

[16] 8 *Del. C.* §§ 170 & 174. The Complaint also claims a violation of Section 173, which states that "[n]o corporation shall pay dividends except in accordance with this chapter" and provides that "[d]ividends may be paid in cash, in property, or in shares of the corporation's capital stock." *Id.* § 173. The citation to Section 173 does not add anything to the constructive dividend theory, which stands—and in this case falls—under Sections 170 and 174.

interpretation of the requirements of our corporation law—where both the statute itself and most transactions governed by it are carefully planned and result from a thoughtful and highly rational process.

Thus, Delaware courts, when called upon to construe the technical and carefully drafted provisions of our statutory corporation law, do so with a sensitivity to the importance of the predictability of that law. That sensitivity causes our law, in that setting, to reflect an enhanced respect for the literal statutory language.

*Speiser v. Baker*, 525 A.2d 1001, 1008 (Del. Ch. 1987) (Allen, C.), *appeal refused*, 525 A.2d 582 (Del. 1987) (TABLE). Although formalism across many domains has ceded the analytical high ground to legal realism or other more pragmatic approaches,

the entire field of corporation law has largely to do with formality. Corporations come into existence and are accorded their characteristics, including most importantly limited liability, because of formal acts. Formality has significant utility for business planners and investors. While the essential fiduciary analysis component of corporation law is not formal but substantive, the utility offered by formality in the analysis of our statutes has been a central feature of Delaware corporation law.

*Uni-Marts, Inc. v. Stein*, 1996 WL 466961, at *9 (Del. Ch. Aug. 12, 1996) (Allen, C.).

One of the formalistic methods of reasoning associated with statutory analysis under the DGCL is the "bedrock doctrine of independent legal significance." *Warner Commc'ns Inc. v. Chris-Craft Indus., Inc.*, 583 A.2d 962, 970 (Del. Ch. 1989) (Allen, C.), *aff'd*, 567 A.2d 419 (Del. 1989) (TABLE). Under this doctrine, "action taken in accordance with different sections of that law are acts of independent legal significance even though the end result may be the same under different sections." *Orzeck v. Englehart*, 195 A.2d 375, 377 (Del. 1963). "The mere fact that the result of actions taken under one section may be the same as the result of action taken under another section does not require that the legality of the result must be tested by the requirements of the

second section." *Id.* at 365-66; *accord Fed. United Corp. v. Havender*, 11 A.2d 331, 338 (1940). *See generally* C. Stephen Bigler & Blake Rohrbacher, *Form or Substance? The Past, Present, and Future of the Doctrine of Independent Legal Significance*, 63 Bus. Law. 1 (2007).

The declaration of a dividend is a specific corporate act governed by specific sections of the DGCL. 8 *Del. C.* §§ 170, 172, 173, 174. Other sections of the DGCL extend the restrictions governing the payment of dividends to redemptions of equity. 8 *Del. C.* §§ 160, 173, 174. No section of the DGCL extends the restrictions governing the payment of dividends to other transactions between a corporation and stockholders, including its sole stockholder. Rather than expanding the statutory sections governing dividends and stock redemptions to other types of transactions, Delaware law evaluates claims about improper transfer payments and self-dealing under the rubric of fiduciary duty. *See Horbal v. Three Rivers Hldgs., Inc.*, 2006 WL 668542, at *3 (Del. Ch. Mar. 10, 2006) (rejecting effort to recast compensation to insiders as a "*de facto* dividend"; observing that "[n]o Delaware court has ever recast executive compensation as a constructive dividend nor (to my knowledge) has any Delaware court recognized such a cause of action to exist. . . ."); *see also Keenan v. Eshleman*, 2 A.2d 904, 912 (Del. 1938) (declining to treat management fees paid by corporation to entity controlled by directors "as a fund for a dividend in which the dissenting stockholders are to share").

Quadrant has identified one case in which a federal district court held that a transfer payment to a stockholder could be construed as an illegal dividend under Delaware law. *Growe v. Bedard*, 2004 WL 2677216 (D. Me. Nov. 23, 2004). The

69

plaintiffs in *Growe* argued that a controlling stockholder used a services agreement to "pull[] large sums of money out of [a subsidiary] while it was insolvent" and that those payments "should be characterized as an illegal dividend ... under Section 174." *Id.* at *12 (internal quotation marks omitted). The *Growe* court denied the defendant directors' motion for summary judgment, finding that the payments "could be characterized as dividends" and noted further that the services agreement could be "simply a tool for vacuuming assets out of the failing [subsidiary] and into its shareholder. . . ." *Id.* To the extent the *Growe* court construed Section 174 to apply to the services agreement, I respectfully disagree with its analysis and do not believe the decision accurately reflects Delaware law. That does not mean that the plaintiffs in *Growe* had no remedy or that the services agreement in *Growe* could not aptly be regarded at the summary judgment stage as "simply a tool for vacuuming assets out of the failing [subsidiary] and into its shareholder. . . ." *Id.* It rather means that the framework Delaware law would use to evaluate such a claim is breach of fiduciary duty, not an expansive reading of the term "dividend" under Section 174.

Quadrant can challenge the payment of service and license fees to ASIA as breaches of fiduciary duty. The same allegations do not state a claim for a statutory violation of the provisions governing dividends.

## D.     Counts III and VI: Injunctive Relief

In Counts III and VI, Quadrant pleads what purport to be separate claims seeking injunctive relief. Count III seeks a permanent injunction to the extent Quadrant prevails on the breach of fiduciary duty theories asserted in Counts I and II. Count VI seeks a

70

permanent injunction to the extent Quadrant prevails on the fraudulent transfer theories asserted in Counts IV and V.

Injunctions are a form of relief, not a cause of action. This court will determine what remedy (if any) it will award after deciding the merits of Quadrant's claims, taking into account the wrongs (if any), the nature of the harm, the facts and circumstances, and any other equities of the case. As a technical matter, Counts III and VI are dismissed because they seek remedies rather than assert claims.

Other than cleaning up the pleadings, this ruling has no effect on the case. In the remedial stage of this action, Quadrant may seek injunctive relief, and the court has not ruled out the possibility of a permanent injunction, if warranted. The defendants have argued that all of the wrongs that Quadrant has identified could be remedied by an award of money damages, which negates the requirement of irreparable harm necessary to support injunctive relief. Given the allegations about Athilon's insolvency, it is possible that the Company would not have sufficient resources to pay a money judgment, making injunctive relief appropriate. *See Gimbel v. Signal Co.*, 316 A.2d 599, 603-604 (Del. Ch. 1974) (finding irreparable harm where defendant directors face large money damages claims and "it is doubtful that any damage claim against the directors can reasonably be a meaningful alternative [to a permanent injunction]"). A permanent injunction also may be appropriate under other circumstances, such as to halt a continuing wrong. It is premature at this stage to rule out the possibility of injunctive relief.

E.    Count X: Conspiracy

71

In Count X, Quadrant alleges a civil conspiracy involving the members of the Board, EBF, and ASIA. This count is a fall-back theory designed to impose secondary liability on any of the alleged wrong-doers who can avoid liability under one of the primary theories, but who still knowingly participated in the underlying wrong. Only Counts I, II, IV, and V have survived the motion to dismiss, so only those counts are relevant to Count X.

Counts IV and V assert fraudulent transfer theories. Under Delaware law, a "conspiracy cannot be predicated on fraudulent transfer . . . ."[17] To the extent Count X seeks to impose secondary liability based on primary wrongs pled in Counts IV and V, it fails to state a claim on which relief can be granted.

This leaves Counts I and II, which assert claims for breach of fiduciary duty against the members of the Board and EBF. A claim for conspiracy to commit a breach of fiduciary duty is usually pled as a claim for aiding and abetting, and although there are differences in how the elements of the two doctrines are framed, it remains unclear to me how the two diverge meaningfully in substance or purpose.[18] If a defendant has acted in a

---

[17] *Cornell Glasgow, LLC v. LaGrange Props, LLC*, 2012 WL 3157124, at *5 (Del. Super. Aug. 1, 2012); *accord Edgewater Growth Capital P'rs, L.P. v. H.I.G. Capital, Inc.*, 2010 WL 720150, at *2 (Del. Ch. Mar. 3, 2010) (Strine, V.C.) (holding that the Uniform Fraudulent Transfer Act "does not create a cause of action for aiding and abetting, or conspiring to commit, a fraudulent transfer"); *see also Trenwick*, 906 A.2d at 203 (noting that "[d]espite the breadth of remedies available under state and federal fraudulent conveyance statutes, those laws have not been interpreted as creating a cause of action for aiding and abetting. Rather . . . the only proper defendants in a fraudulent conveyance action under federal bankruptcy law or Delaware law are the transferor and any transferees.") (internal quotation marks omitted).

[18] *See Malpiede*, 780 A.2d at 1098 n.82 (noting in reference to underlying claim for breach of fiduciary duty that "[a]lthough there is a distinction between civil conspiracy and

72

fiduciary capacity, then that defendant is liable as a fiduciary and not for aiding and abetting. But if a defendant proves that it is not a fiduciary or has not acted in a fiduciary capacity as to the matter in dispute, then the defendant could be liable for aiding and abetting. Given that the individual defendants are directors of Athilon and EBF owns all of its equity, it seems likely that they will be liable as fiduciaries or not at all, but there perhaps could be a circumstance where EBF might have acted in a non-fiduciary capacity and be liable for aiding and abetting. *Cf. OTK Assocs. v. Friedman*, 85 A.3d 696, 719-20 (Del. Ch. 2014) (noting that allegations of complaint could support theory that alleged controller acted as fiduciary and breached its duties, or controller could demonstrate that it sufficiently disabled itself to act solely as a third party).

---

aiding and abetting, we do not find that distinction meaningful here"); *Carsanaro v. Bloodhound Tech., Inc.*, 65 A.3d 618, 642 (Del. Ch. 2013) (finding claims for aiding and abetting a breach of fiduciary duty and conspiracy to commit a breach of fiduciary duty to be "functionally equivalent"); *Triton Const. Co., Inc. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *17 (Del. Ch. May 18, 2009) (finding that claim for aiding and abetting breach of fiduciary duty duplicated claim for civil conspiracy), *aff'd*, 988 A.2d 938 (Del. 2010) (TABLE); *Allied Capital Corp. v. GC–Sun Hldgs., L.P.*, 910 A.2d 1020, 1038 (Del. Ch. 2006) (Strine, V.C.) (stating that "courts have noted that in cases involving the internal affairs of corporations, aiding and abetting claims represent a context-specific application of civil conspiracy law"); *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 2005 WL 583828, at *7 (Del. Ch. Feb. 4, 2005) (equating claim for aiding and abetting breach of fiduciary duty with conspiracy to commit breach of fiduciary duty), *aff'd*, 906 A.2d 114 (Del. 2006); *Weinberger v. Rio Grande Indus., Inc.*, 519 A.2d 116, 131 (Del. Ch. 1986) ("A claim for civil conspiracy (sometimes called 'aiding and abetting') requires that three elements be alleged and ultimately established. . . ."); *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1057 (Del. Ch. 1984) (identifying the same elements for "a claim of civil conspiracy" as for aiding and abetting), *aff'd*, 575 A.2d 1131 (Del. 1990); *but see Metro. Life Ins. Co. v. Tremont Gp. Hldgs., Inc.*, 2012 WL 6632681, at *18-20 (Del. Ch. Dec. 20, 2012) (analyzing claim for aiding and abetting a breach of fiduciary duty separately from conspiracy to commit a breach of fiduciary duty); *Hospitalists of Del., LLC v. Lutz*, 2012 WL 3679219, at *15-16 (Del. Ch. Aug. 28, 2012) (same).

ASIA has not been sued for breach of fiduciary duty. The Complaint adequately alleges that ASIA is controlled by EBF such that for pleading purposes, the EBF's knowledge should be imputed to ASIA. The Complaint also adequately alleges that Vertin and Sullivan are employees and agents of EBF, such that their knowledge would be imputed for pleading purposes both to EBF and to its controlled affiliates, like ASIA. Counts I and II of the Complaint plead claims for breach of fiduciary duty against the individual defendants and EBF. Count X therefore pleads a claim against ASIA for aiding and abetting, at least to the extent that Counts I and II relate to ASIA's alleged role as a conduit for the tunneling of value from Athilon to EBF.

The motion to dismiss Count X is therefore denied to the extent it seeks to impose secondary liability on the individual defendants, EBF, and ASIA for the underlying wrongs pled in Counts I and II, and to the extent the individual defendants and EBF are not held liable as fiduciaries on the primary claims.

## III. CONCLUSION

Counts I, II, IV, and V state claims on which relief can be granted to the extent they challenge the non-deferral of payments on the Junior Notes and the service and license fees paid to ASIA. Count X states a claim for secondary liability in connection with the underlying wrongs pled in Counts I and II. The other counts of the Complaint are dismissed.